PRECEDENTIAL
UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 09-3526
_____

HENRY ADAMSON,

Appellant

v.

CATHEL, ADMINISTRATOR OF NEW JERSEY STATE
PRISON;
PAULA T. DOW, THE ATTORNEY GENERAL OF THE
STATE OF NEW JERSEY


_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 06-cv-3194)
District Judge:  Hon. Peter G. Sheridan
_____

Argued
October 4, 2010

Before: SCIRICA, FUENTES and JORDAN, *Circuit Judges*.

(Filed March 1, 2011)
_____

Lon Taylor [ARGUED]
Office of Public Defender
25 Market Street
Richard J. Hughes Justice Complex
Trenton, NJ 08626
     *Counsel for Appellant*

Steven E. Braun [ARGUED]
Office of County Prosecutor
401 Grand Street
Paterson, NJ 07505
     *Counsel for Appellees*

_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*.

Henry Adamson, a New Jersey prisoner convicted in 1998 of holding up a pool hall and robbing its patrons, appeals from an order of the United States District Court for the District of New Jersey denying his petition for a writ of habeas corpus. Adamson claims that his constitutional right to confront witnesses was violated when, at trial, the government introduced confessions of his alleged accomplices for the purpose of impeaching Adamson's

2

testimony that his own confession had been fabricated by a police officer. Because admission of the accomplices' statements without a limiting instruction was contrary to clearly established Supreme Court precedent, we will reverse the District Court's decision and grant Adamson's habeas petition.

## I. Factual Background and Procedural History

### A. Factual Background

In the early morning of December 14, 1996, several masked and armed men entered Brother's Candy Store, a pool hall and social club in Passaic, New Jersey, and robbed several patrons. A police officer arriving at the scene saw three men flee in one direction, and two flee in another. The officer pursued the latter two and ultimately apprehended one of them, Darren Napier. When the officer returned to headquarters with Napier, he recognized the second man he had chased from the robbery scene, Gaumaal Aljamaar,[1] in a holding cell. Both Napier and Aljamaar provided statements to the police (the "accomplice statements"), which detailed their involvement in the robbery and implicated Adamson.

Three days later, Adamson received a call from his girlfriend, Yvette Robinson, whose car had been used in the robbery. She informed him that the police were going to

_____

[1] The Superior Court of New Jersey Appellate Division ("Appellate Division") and the State's brief employ the spelling "Aljamaar," the trial transcript uses "Aljaamar," and Adamson's brief uses the spelling "Aljmaar." We adopt the Appellate Division's spelling of the name.

3

charge her with conspiracy to commit robbery and that they were looking for him. Adamson then surrendered himself peacefully to the police. After waiving his *Miranda* rights, he gave a statement to Detective Julius Cirelli, which, like Napier's and Aljamaar's statements, was transcribed. According to Detective Cirelli, he took Adamson's statement by asking questions and typing Adamson's answers on a computer. Adamson's statement described the planning and execution of the robbery. It detailed how and where he and his co-conspirators met to plan the robbery, the number and types of guns used in the robbery, the attempt by one co-conspirator to back out of the robbery, and the step-by-step execution of the robbery, including specifics such as who went into the club first, who held which gun, who hit a patron with a shotgun, who took jewelry and money from patrons, and how the assailants disposed of their weapons. After giving his statement, Adamson read a printed version of it, initialed each answer in it, and signed it.

Adamson was later indicted for numerous offenses related to the robbery. He was tried in the New Jersey Superior Court, separately from his co-conspirators, and his confession was admitted against him at trial through Detective Cirelli's testimony. Because the patrons of Brother's Candy Store could not identify the masked robbers, the confession was key to the prosecution, and Adamson attacked its validity, testifying on direct examination that it was false. He claimed that Detective Cirelli had threatened to charge his girlfriend if he did not confess, that he signed the confession but never read it, and that the details in it came from the written statements of Napier and Aljamaar, which were provided to Adamson before he made his own

4

statement. He also claimed that Detective Cirelli supplied additional details that were included in the confession.

During cross-examination at trial, the prosecutor attacked Adamson's testimony regarding the motive for and content of his confession. The prosecutor began by clarifying Adamson's position on the accomplice statements:

> Prosecutor: Now, you said during your direct testimony that you were given two other statements to read prior to giving [your] statement. Is that right?
>
> Adamson: Yes.
>
> Prosecutor: And that's your testimony. That's how you knew these details. Is that what you're trying to tell us?
>
> Adamson: Yes.
>
> Prosecutor: Whose other statement specifically was it that you were given?
>
> Adamson: Aljamaar and Darren Napier.
>
>                        ***
>
> The Court: You read those statements?
>
> Adamson: Yes.

5

The Court: Before you gave your statement.

Adamson: Yes.

(App. at 78.)

The prosecutor then marked the accomplice statements for identification and began to impeach Adamson by questioning him on the differences between them and his confession. In the colloquy that followed, the prosecutor recited and paraphrased significant portions of the accomplice statements. Importantly, those portions not only highlighted the differences between the accomplice statements and Adamson's confession, they also directly implicated Adamson in the robbery, as the following cross-examination excerpts demonstrate:

Prosecutor: You used the four door green colored Acura in your girl friend's name?

Adamson: I didn't use no car for the robbery.

Prosecutor: That's what Mr. Napier says?

Adamson: In his statement, yes.

\*\*\*

Prosecutor: [Mr. Napier] says that … you had the small handgun [at the pool hall] … .

6

Adamson:      That's what he said.

                                    ***

Prosecutor:   [I]n [Mr. Aljamaar's] statement
              he says that you have a friend that
              goes to the pool hall in Passaic …
              and the people inside have a lot of
              money.

Adamson:      That's what he said in his statement, yes.

Prosecutor:   He said you started thinking this
              was a good place to hit. Is that
              right?

Adamson:      That's what he said, yes.

                                    ***

Prosecutor:   [Mr. Aljamaar] said that you had
              a nine millimeter handgun [at the
              pool hall] … .

Adamson:      Yes.

Prosecutor:   All right. [Mr. Aljamaar] further
              said that you and General[,
              another alleged accomplice,] were
              going to walk around to see how
              many people were inside the pool
              hall. That's what he said?

7

Adamson:     That's what he says, yes.

Prosecutor:  And he further stated that you and General came back and said that there were between nine to twelve people inside the pool hall and that you said let's do it. That's what [Mr. Aljamaar] said?

Adamson:     I need to see that because I don't remember that part.

Prosecutor:  Okay. Look to the fifth line down, page 2 of Mr. Aljamaar's statement.

Adamson:     Then, they said let's do it.

(App. at 81-82.) Adamson did not object to the use of the accomplice statements by the prosecutor on cross examination.

During closing argument, the prosecutor focused on the inconsistencies between Adamson's confession and the accomplice statements, arguing that those inconsistencies showed that Adamson's story about his confession being based on the accomplice statements could not be believed. The prosecutor also criticized Adamson's claim that the police fabricated the confession, wondering aloud, "if Sergeant Cirelli was trying to get [Adamson] to fabricate, why [would he] not pick one of the statements and follow it to the T, follow it by the letter?" (App. at 87.) The prosecutor then drew the jury's attention to how Adamson's confession was consistent with the account of events given by

8

some of the victims and officers.  The conclusion pressed by the prosecutor was that the "statement … given by Henry Adamson ... clearly and unequivocally establishes his involvement and his guilt in this particular offense."  (App. at 88.)  Adamson did not object to the use of the accomplice statements during closing arguments.

The day after closing arguments, the Superior Court instructed the jury.  At no point did the Court provide an instruction to the jury limiting consideration of the accomplice statements to impeachment purposes or otherwise preventing the jury from considering those statements for their truth, nor did Adamson seek such an instruction.  The jury found Adamson guilty on all counts except for attempted murder, and the Court sentenced him to a term of life imprisonment with a consecutive ten-year sentence and a total of thirty years of parole ineligibility.

B.     Procedural History

1.     Direct Appeal

Adamson appealed his conviction and sentence to the Superior Court Appellate Division.  On appeal, he asserted, among other things, that the government's use of the accomplice statements during his cross-examination violated his Sixth Amendment right to confront witnesses, especially since no limiting instruction was given to the jury.  In an October 5, 2000 opinion, the Appellate Division rejected that challenge, explaining that "[a]n accomplice's out-of-court statement may be used for a purpose other than proving the truth of what it asserts without violating a defendant's right of confrontation."  (App. at 52 (quotations omitted).)  In so

9

holding, the Appellate Division relied on the United States Supreme Court's decision in *Tennessee v. Street*, in which the Supreme Court approved the use of a co-conspirator's statement to impeach a defendant who claimed that his own statement to police was fabricated and based upon the co-conspirator's. 471 U.S. 409, 413-14 & 417 (1985).

Although a limiting instruction had been given in *Street* to prohibit the jury from considering the co-conspirator's statement for its truth, *id.* at 414-15, the Appellate Division in Adamson's case decided that, although *Street* applied, the lack of a limiting instruction was not fatal to Adamson's conviction. "While we agree that a limiting instruction should have been given," the Court said, "we nevertheless conclude [that] its omission did not constitute plain error." (App. at 53.) The Appellate Division explained that Adamson's failure to request such an instruction at trial weakened his case on appeal and required that he show it was plain error not to give the instruction. The Appellate Division then said it was "satisfied" that the trial court did not plainly err because, "beyond a reasonable doubt, … the error did not lead the jury to a result it otherwise might not have reached":

> The issue concerning the validity of [Adamson's] confession, whether it was his or one dictated by Detective Cirelli, was clearly before the jury. The unobjected to cross examination by the State which revealed portions of the contents of the statements did not prejudice [Adamson,] given his insistence that Cirelli used the statements to formulate his confession. The record is more than adequate to support a determination on the part of the

10

> jury that the defense raised by [Adamson] was simply not credible.

(App. at 54.) Thereafter, Adamson filed a petition for certification with the Supreme Court of New Jersey, which was denied, as was his subsequent petition for certiorari to the United States Supreme Court.

### 2. *Post-Conviction Relief*

Adamson sought and was denied post-conviction relief in the New Jersey state courts. He subsequently filed a petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, in the District Court, arguing that he was entitled to habeas relief because the use of the accomplice statements during his cross-examination, without a limiting instruction to the jury, violated the Confrontation Clause of the Sixth Amendment.[2]

The District Court concluded that the Appellate Division's ruling was neither contrary to nor an unreasonable application of *Street*. The thrust of the Court's analysis was that Adamson's case is factually indistinguishable from *Street* and thus, as in *Street*, the State's use of the accomplice statements for impeachment purposes did not run afoul of the Confrontation Clause. The District Court rejected Adamson's argument that "the presence of a limiting instruction is essential to the constitutionality of a *Street*-type submission of evidence." (App. at 27.) Since Adamson failed to request

---

[2] Adamson also challenged his sentence; however, that issue was not included in the certificate of appealability in this case and is therefore not before us.

11

such an instruction at trial, the Court reduced his argument to "a claim that it would be desirable for the trial judge to drive home the non-hearsay purpose of [the] prosecutorial examination further … ." (*Id*. at 29.) However, said the Court, "the fact that the instructions could have been better does not render them unconstitutional." (*Id*.) Accordingly, the District Court concluded that the Appellate Division's ruling was neither contrary to nor an unreasonable application of Supreme Court precedent.

Having rejected all of Adamson's arguments, the District Court denied his petition for a writ of habeas corpus and also denied a certificate of appealability. Adamson timely sought a certificate of appealability from us. We granted him one "with respect to [his] claim that his Sixth Amendment right to confront his accusers was violated by the prosecution's introduction of his co-defendants' statements during his trial."

## II.     Jurisdiction and Standard of Review

The District Court had jurisdiction over Adamson's petition pursuant to 28 U.S.C. § 2254. We have appellate jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253. The District Court did not conduct an evidentiary hearing, so our standard of review is plenary. *See McMullen v. Tennis*, 562 F.3d 231, 236 (3d Cir. 2009) ("Because the District Court ruled on the petition without conducting an evidentiary hearing, this Court conducts a plenary review.").

12

Adamson's confrontation claim was adjudicated on the merits and exhausted in State court proceedings,[3] and we are thus bound by the standards of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See Harris v. Ricci*, 607 F.3d 92, 96 (3d Cir. 2010) ("Because this case arises from a state court proceeding in which the merits of [petitioner's] sole claim on appeal were adjudicated, the standards established by [AEDPA] apply.").[4] Under AEDPA, a federal court may not grant a writ of habeas corpus with respect to a claim that was adjudicated on the merits in state court proceedings unless the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). "[C]learly established law as determined by [the Supreme] Court 'refers to the holdings, as opposed to the dicta, of th[e] Court's decisions as of the time of the relevant state-court decision.'" *Yarborough v. Alvarado*, 541 U.S. 652, 660-61 (2004) (quoting *Williams*, 529 U.S. at 412). Here, the Appellate Division's October 5, 2000 decision on the Sixth Amendment Confrontation Clause issue is the relevant state ruling. *See Newland v. Hall*, 527

---

[3] Adamson did not raise any Confrontation Clause issues in his post-conviction petitions to the New Jersey state courts. "A petitioner who has raised an issue on direct appeal, however, is not required to raise it again in a state post-conviction proceeding." *Lambert v. Blackwell*, 134 F.3d 506, 513 (3d Cir. 1997).

[4] Adamson filed his federal habeas petition after AEDPA's effective date, so the statute applies to his case. *Williams v. Taylor*, 529 U.S. 420, 429 (2000).

13

F.3d 1162, 1199 (11th Cir. 2008) ("[T]he highest state court decision reaching the merits of a habeas petitioner's claim is the relevant state court decision.").

As AEDPA makes clear, only if the Appellate Division's decision was "contrary to" or an "unreasonable application of" the governing Sixth Amendment legal principles, as established by the Supreme Court, can Adamson gain habeas relief. The Supreme Court has afforded independent meaning to the words "contrary to" and "unreasonable application of [law]."[5] *Williams*, 529 U.S. at 405. "Contrary to" means "diametrically different," "opposite in character or nature," or "mutually opposed." *Id*. The "contrary to" prong of AEDPA applies when "the state court reaches a conclusion opposite to the Supreme Court's own conclusion on a question of law or decides the case differently where the Supreme Court was confronted by a set of materially indistinguishable facts." *McMullen*, 562 F.3d at 236. "A state-court decision will certainly be contrary to [the Supreme Court's] clearly established precedent if the state court applies a rule that contradicts the governing law set

---

[5] In giving separate effect to both the "contrary to" and "unreasonable application" prongs of § 2254(d)(1), the Supreme Court has had to eschew some measure of the ordinary meaning of those words. It would seem that when a state court's analysis of a prisoner's constitutional claim is contrary to Supreme Court precedent, it is necessarily also an unreasonable application of the law. But, under *Williams*, "contrary to" is not a subset of "unreasonable application," and we follow the now well-established definitions provided in that case, 529 U.S. at 405.

14

forth in [the Supreme Court's] cases." *Williams*, 529 U.S. at 405.

The "unreasonable application" prong of AEDPA applies when a "state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quotations omitted). That test is an objective one and does not permit a court to grant relief simply because the state court might have incorrectly applied federal law to the facts of a certain case. *Id.* at 520-21.

Even if we find constitutional error in the state court's decision, we must determine if that error was harmless or if it instead "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *see also Fry v. Pliler*, 551 U.S. 112, 121 (2007) ("We hold that in § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in *Brecht* … ."). Only in the latter event will we grant habeas relief.

### III. Discussion

Our conclusion is that the presentation at Adamson's trial of portions of his accomplices' incriminating statements, without a limiting instruction, was contrary to the Supreme Court's clearly established precedent in *Street*, which required such an instruction. We further conclude that the accomplice statements, combined with the lack of a limiting instruction, had a substantial and injurious effect on the jury's

15

verdict. Adamson's habeas petition is therefore well-founded.

> A. The Appellate Division's Opinion Was Contrary to Clearly Established Supreme Court Precedent

The Confrontation Clause of the Sixth Amendment, applicable to the States through the Fourteenth Amendment, requires that a criminal defendant be given the right "to be confronted with the witnesses against him," and includes the right to cross-examine those witnesses. U.S. CONST. amends VI, XIV; *see Richardson v. Marsh*, 481 U.S. 200, 206 (1987). At the time the Appellate Division issued its opinion, Confrontation Clause jurisprudence permitted testimonial hearsay to be admitted against a defendant, provided it bore sufficient "indicia of reliability."[6] *See Ohio v. Roberts*, 448 U.S. 56, 66 (1980). Furthermore, clearly established Supreme Court law guided lower courts as to when and how confessions of co-conspirators could be introduced at trial in a manner that did not offend the Confrontation Clause. *See Bruton v. United States*, 391 U.S. 123, 136-37 (1968) (holding that the admission of a pretrial confession of a

---

[6] With the Supreme Court's decision in *Crawford v. Washington*, that has changed. 541 U.S. 36, 53-54 (2004) (prohibiting "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination"). Even after *Crawford*, however, "[t]he [Confrontation] Clause ... does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Id*. at 59 (citing *Street*, 471 U.S. at 414).

16

nontestifying co-defendant that incriminates the defendant violates that defendant's right to confront witnesses even if a limiting instruction is given); *see also Richardson*, 481 U.S. at 203 & 211 (permitting admission of the confession of a non-testifying co-defendant which was "redacted to omit all reference to [the defendant]" when the jury was instructed to use the information only against the non-testifying defendant).

In *Street*, the Supreme Court addressed whether introduction of a co-conspirator's confession at trial for an impeachment purpose offends the Confrontation Clause. Harvey Street and an accomplice were arrested for burglary and murder. 471 U.S. at 411. After their arrests, both men confessed to a Sheriff. *Id.* At trial, Street repudiated his confession and asserted that the Sheriff read him his accomplice's confession and "directed him to say the same thing." *Id.* To rebut Street's claim that his confession was fabricated, the State had the Sheriff read to the jury the accomplice's confession, which directly implicated Street. *Id.* at 411-12. Before the Sheriff read the accomplice's statement to the jury, however, "the trial judge twice informed the jury that it was admitted 'not for the purpose of proving the truthfulness of his statement, but for the purpose of rebuttal only.'" *Id.* at 412. The trial court included a similar limiting instruction in its final instructions to the jury. *Id.*

The Supreme Court concluded that "[t]he *nonhearsay* aspect of [the co-conspirator's] confession – not to prove what happened at the murder scene but to prove what happened when [the defendant] confessed – raise[d] no Confrontation Clause concerns. " *Id*. at 414 (emphasis in

17

original). Instead, the concern was that the jury might use the co-conspirator's statement in a manner inconsistent with the Confrontation Clause, i.e., to infer Street's guilt even though Street had had no opportunity to cross-examine the witness. *Id.* But, the Court found no such problem in Street's case, "hold[ing] that the trial judge's instructions were the appropriate way to limit the jury's use of [the co-conspirator's confession] in a manner consistent with the Confrontation Clause." *Id.* at 417.

*Street* is one application of the general, long-standing principle that the potential for jury misuse of evidence can often be curbed by a limiting instruction. Indeed, whenever the Supreme Court has permitted a jury to consider evidence that has the potential to be misused, e.g., to be considered in a way that would violate the defendant's constitutional rights, it has required that a proper jury instruction be given to avoid the misuse. *See, e.g.*, *Harris v. New York*, 401 U.S. 222, 226 (1971) (holding that statements elicited from a defendant in violation of his *Miranda* rights could be introduced to impeach that defendant's credibility when the jury was instructed that the statements were not to be considered as evidence of his guilt); *Spencer v. Texas*, 385 U.S. 554, 559-61 (1967) (holding that evidence of a defendant's prior criminal convictions could be introduced for the purpose of sentence enhancement if the jury was instructed that the evidence could not be used for the purposes of determining guilt); *Walder v. United States*, 347 U.S. 62, 64 (1954) (holding that the admission of unlawfully seized evidence of a crime was admissible if the jury was instructed that the evidence could be considered only in assessing a defendant's credibility and not for determining guilt); *cf. Watkins v. Sowders*, 449 U.S. 341, 347 (1981) (condoning the admission of erroneously

18

admitted eyewitness identification evidence when the jury was instructed not to consider it, regardless of the dissent's observation that such evidence "has a powerful impact on juries").

These precedents are premised on the belief that juries follow the instructions they are given. *See Richardson*, 481 U.S. at 211 ("The rule that juries are presumed to follow their instructions is a pragmatic one, rooted less in the absolute certitude that the presumption is true than in the belief that it represents a reasonable practical accommodation of the interests of the state and the defendant in the criminal justice process."). In the Confrontation Clause context, however, the Supreme Court has recognized that the risk of prejudice stemming from the introduction of a co-defendant's confession is so high that, in some circumstances, even a limiting instruction cannot cure the constitutional problem. *See Bruton*, 391 U.S. at 136 ("[T]here are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored."); *see also Gray v. Maryland*, 523 U.S. 185, 196 (1998) (holding that a properly instructed jury may not consider the redacted confession of a co-defendant which "obviously refer[ed] directly to someone, often obviously the defendant"). It is only when a co-defendant's statement can be redacted so that it does not at all implicate the defendant that admission of the statement can be justified, and then only when an instruction is given limiting consideration of the statement to whether the co-defendant is guilty. *Richardson*, 481 U.S. at 211; *see also Cruz v. New York*, 481 U.S. 186, 193 (1987) ("We hold that, where a nontestifying codefendant's confession incriminating the

19

defendant is not directly admissible against the defendant, ... the Confrontation Clause bars its admission at their joint trial, even if the jury is instructed not to consider it against the defendant, and even if the defendant's own confession is admitted against him." (internal citation omitted)). It is therefore not surprising that *Street* requires a limiting instruction to preserve the Sixth Amendment Confrontation Clause rights of a defendant when a jury is permitted to consider for impeachment value a nontestifying accomplice's statement that incriminates the defendant.

The Appellate Division correctly identified *Street* as the governing rule but held that there was no Confrontation Clause problem simply because the prosecutor had emphasized the impeachment purposes of the problematic statements.[7] But *Street* makes clear that a jury's understanding of the distinction between substantive and impeachment uses of inculpatory evidence cannot be taken for granted. An appropriate limiting instruction is necessary to prohibit jury misuse of such evidence. Of particular importance here, the presence of such an instruction was

---

[7] For reasons unclear to us, Adamson argues that his case is factually distinguishable from *Street*, contending that the accomplice statements did not actually impeach his testimony and that they are far less probative than the statement at issue in *Street*. We agree with the District Court that, other than the absence of a limiting instruction, the facts of this case are indistinguishable from *Street* in any material way. That the accomplice statements were admitted during Adamson's testimony, instead of Cirelli's or another officer's testimony, does not change our conclusion.

essential to the holding in *Street*.[8]  471 U.S. at 417 ("[W]e hold that the trial judge's instructions were the appropriate way to limit the jury's use of [the co-conspirator's confession] in a manner consistent with the Confrontation

---

[8] Nonhearsay use of statements generally raises no Confrontation Clause concerns. *United States v. Jimenez*, 513 F.3d 62, 81 (3d Cir. 2008) ("Nonhearsay use of evidence as a means of demonstrating a discrepancy does not implicate the Confrontation Clause."); *United States v. Hinton*, 423 F.3d 355, 358 n.1 (3d Cir. 2005) ("As we held in *United States v. Trala*, testimonial statements are admissible without prior cross examination if they are not offered for their truth."). But we and our sister circuits have acknowledged *Street*'s teaching that a limiting instruction is necessary where, as here, nonhearsay use is made of expressly incriminating statements. *See United States v. Trala*, 386 F.3d 536, 544 (3d Cir. 2004) (noting the importance of the limiting instruction in *Street*), *vacated on other grounds*, 546 U.S. 1086 (2006); *see also Ray v. Boatwright*, 592 F.3d 793, 797 (7th Cir. 2010) (finding confrontation clause violation when co-actors' statements were introduced into evidence in prosecution's case-in-chief, as opposed to on rebuttal, and no limiting instruction was given); *Furr v. Brady*, 440 F.3d 34, 39 (1st Cir. 2006) ("[The *Street* Court] noted that, absent other circumstances, it is sufficient that the codefendant statement is nonhearsay – viz., not admitted for the truth of the matter asserted, and [that] the court gives a limiting jury instruction to that effect."); *Lee v. McCaughtry*, 892 F.2d 1318, 1325-26 (7th Cir. 1990) (rejecting confrontation clause challenge when out of court statements were played for the jury and the trial court gave a limiting instruction at the time the statements were introduced).

Clause."). The fundamental problem with the Appellate Division's opinion is that it divorces *Street*'s conclusion that the Confrontation Clause permits use of a co-defendant's confession for impeachment purposes from its corresponding requirement that, in such circumstances, the jury must be instructed to consider the confession for impeachment only.

The Appellate Division correctly observed that, when weighing Adamson's trial testimony, the jury should have been instructed to consider the accomplice statements solely for their impeachment value. However, the Appellate Division held that the trial court's failure to give such an instruction was not plain error, suggesting that a limiting instruction, though preferred, is optional from a constitutional standpoint. We are compelled to disagree. The failure to instruct the jury regarding the proper use of the accomplice statements, statements which facially incriminated Adamson, was plain and obvious error that was directly contrary to *Street*'s holding. Without a limiting instruction to guide it, the jury that found Adamson guilty was free to consider those facially incriminating statements as substantive evidence of Adamson's guilt. The careful and crucial distinction the Supreme Court made between an impeachment use of the evidence and a substantive use of it on the question of guilt was completely ignored during the trial. Adamson's constitutional right to confront witnesses was therefore violated by the presentation at trial of portions of the accomplice statements. The Appellate Division's opposite conclusion was contrary to clearly established Federal law, as determined by the Supreme Court.

### B. Adamson was Prejudiced by the Violation of His Confrontation Rights

Having concluded that the Appellate Division's decision was contrary to clearly established Federal law, we must consider whether the constitutional error which it perpetuated – the unrestricted introduction of non-testifying accomplice statements – was harmless or whether it resulted in actual prejudice to Adamson. *See Brecht*, 507 U.S. at 637 ("[H]abeas petitioners ... are not entitled to habeas relief based on trial error unless they can establish that it resulted in actual prejudice." (Internal quotation marks and citation omitted)). "[A]n error is harmless unless it had substantial and injurious effect or influence in determining the jury's verdict." *Fry*, 551 U.S. at 116 (internal quotation marks and citations omitted). If an error did have that kind of effect, then, by definition, it resulted in actual prejudice. Our role is to ask whether we think the constitutional error "substantially influenced the jury's decision." *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995). "If, when all is said and done, the [court's] conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand." *Id.* at 437-38 (quoting *Kotteakos v. United States*, 328 U.S. 750, 764-65 (1946)) (alteration in original). But if we have "grave doubt" about whether the error had substantial and injurious effect or influence in determining the jury's verdict, we must conclude that the error was not harmless. *Id.* at 438. The Supreme Court has cautioned that "The uncertain judge should treat the error, not as if it were harmless, but as if it affected the verdict (*i.e.,* as if it had a 'substantial and injurious effect or influence in determining the jury's verdict')." *Id.*

We do have such doubt about the error in this case. Though we do not do so lightly,[9] we must disagree with the State's contention that Adamson was not prejudiced by the absence of a limiting instruction because he failed to request the limiting instruction and because the evidence against him was "overwhelming." (Appellees' Ans. Br. at 15.)

First, as a practical matter, we do not see how Adamson's failure to request the limiting instruction means that he was not prejudiced. It may raise questions about the effectiveness of his counsel,[10] but it does not alter the effect that the lack of a limiting instruction may have had on the jury's verdict.[11]

---

[9] "We emphasize that because of the deference and respect that we give the … state courts, not only because of the requirements of AEDPA but in general, we reach our result reluctantly." *Vazquez v. Wilson*, 550 F.3d 270, 281 (3d Cir. 2008).

[10] We are not inclined to accept the State's position, raised at oral argument, that the failure to request a limiting instruction could have been a strategic choice by the defense. The advantage to the defense of having such incriminating evidence admitted and repeatedly referenced without a limiting instruction is far from apparent. Furthermore, the State's suggestion that Adamson's counsel made a strategic decision to avoid drawing the jury's attention to the accomplice statements strains credulity since those statements comprised the essence of the State's rebuttal to Adamson's defense and were specifically brought to the jury's attention in the State's closing.

[11] The State cites *Albrecht v. Horn*, arguing that

Second, most of the "overwhelming" evidence the State points to concerns the robbery itself. The State notes that patrons of the pool hall said a robbery occurred, guns and dog repellant were recovered at or near the robbery scene, and the responding officer discovered evidence of the crime left by a suspect fleeing the scene, all of which is true but does nothing to incriminate Adamson. The State's case against Adamson rested on his own confession, which he claimed was fabricated, and on the accomplice statements, which directly implicated him in the robbery. Without looking to the accomplice statements for their truth, we cannot say that the evidence against Adamson, i.e., his confession alone, was so overwhelming as to make the unrestricted admission of the

Adamson's failure to object to the admission of the accomplice statements mandates that we review for plain error and determine if the lack of a limiting instruction "infected the entire trial with unfairness." 485 F.3d 103, 129 (3d Cir. 2007). *Albrecht* involved a due process challenge to the lack of a limiting instruction for the use of prior bad acts evidence as propensity evidence. Here, Adamson does not expressly challenge his conviction on due process grounds. We note, however, that the requirements for plain error are met: an obvious error was committed, it affected Adamson's substantial right to confront witnesses against him, and it seriously affected the fairness of his trial. *See United States v. Lessner*, 498 F.3d 185, 192 (3d Cir. 2007) (holding that plain error exists when (1) an error was committed (2) that was plain, (3) that affected the defendant's substantial rights, and (4) **Error! Main Document Only.**the error seriously affects the fairness, integrity, or public reputation of judicial proceedings).

25

accomplice statements of little moment. There were no eyewitness statements identifying Adamson as taking part in the robbery, nor was there any physical evidence tying him to the robbery. *Cf. Bond v. Beard*, 539 F.3d 256, 276 (3d Cir. 2008) (holding harmless the admission of a nontestifying co-defendant's confession in violation of the Confrontation Clause when there was extensive evidence of the defendant's guilt, including the defendant's allegedly coerced confession and an eyewitness who testified that he was "absolutely certain" that the defendant committed the crime).

We do not suggest that, had there been no error, the evidence would have been insufficient to sustain a conviction. As the Appellate Division noted, the issue of Adamson's credibility was certainly before the jurors, and they could have convicted Adamson because they did not believe the claim that his confession was fabricated or coerced. Indeed, the jury could have arrived at that conclusion by using the accomplice statements for permissible impeachment purposes. We also note that the prosecutor's use of the statements for their impeachment value was permissible and mitigates the possibility that the jury considered the substance of the statements for their truth.[12] *See Street*, 471 U.S. at 417.

---

[12] In closing, the prosecutor argued to the jurors that the discrepancies among the statements reflected that Adamson was lying. Even though the trial court did not limit the use of Napier's and Aljamaar's statements, the jury was, nevertheless, being urged to use them for impeachment purposes only. At no point did the prosecutor or the court suggest that the jury should use Napier's and Aljamaar's statements for their truth in order to establish Adamson's guilt.

Nevertheless, given the strong potential for an accomplice's confession that implicates the defendant to unfairly infect the trial if considered as substantive evidence of guilt, and given the lack of otherwise overwhelming evidence of guilt, we have serious concerns that the verdict was substantially influenced by the constitutional error. It is only natural that a juror, upon hearing the out-of-court statements from two admitted participants in the robbery saying that Adamson was involved, would consider those statements in assessing guilt, unless instructed otherwise. *Cf. Bruton*, 391 U.S. at 135-36 (describing "extrajudicial statements of a codefendant" as "devastating to the defendant"); *see also Vazquez v. Wilson*, 550 F.3d 270, 280 (3d Cir. 2008) (recognizing "the chance that the jury will credit [a nontestifying codefendant's incriminating statement] and conclude that the statement pointed to the objecting defendant as the offender even though he could not cross-examine the declarant"). Accordingly, we hold that the error was not harmless and that Adamson is entitled to the relief he seeks. [13]

---

[13] We recognize that there is some academic discussion about the continued propriety of federal habeas relief in noncapital cases to correct case-specific errors. *See, e.g.*, Joseph L. Hoffman & Nancy J. King, *Rethinking the Federal Role in State Criminal Justice*, 84 N.Y.U. L. REV. 791, 793 & 818 (2009) (arguing that federal habeas is necessary to correct "structural and systemic" constitutional problems and that "as a means of correcting or deterring routine, case-specific constitutional errors, habeas is completely ineffectual in all but capital cases" so federal resources should be redeployed to reform the "state systems of defense representation" and

## IV. <u>Conclusion</u>

For the foregoing reasons we will reverse the District Court's denial of Adamson's petition, and will remand the case for further proceedings consistent with this opinion. Specifically, the District Court should order that the New Jersey authorities free Adamson from custody unless he is retried in the state courts within a reasonable period of time.

---

"help prevent constitutional violations from occurring in the first place"). We must leave to others the debate over the place that habeas relief should have in our justice system. The law as it now stands requires us to correct errors of constitutional magnitude, case by case, as we do here.