Filed 9/5/17

# <u>CERTIFIED FOR PARTIAL PUBLICATION</u>\*

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B270506 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA135789) |
| v. | |
| MICHAEL SHANE WASHINGTON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Eleanor J. Hunter, Judge.  Affirmed.

Ralph H. Goldsen, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Steven D. Matthews, Supervising Deputy Attorney General, and Joseph P. Lee and Ryan M. Smith, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \* \* \* \*

---

\*    Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of Part III. of the Discussion section.

Under the so-called *Aranda*/*Bruton* doctrine, a trial court may generally not allow a jury in a joint criminal trial of a defendant and codefendant to hear the unredacted confession of the codefendant that also directly implicates the defendant—even if the jury is instructed not to consider the confession as evidence against the defendant. (*People v. Aranda* (1965) 63 Cal.2d 518, 529-531 (*Aranda*), abrogated in part by Cal. Const., art. I, § 28, subd. (d); *Bruton v. United States* (1968) 391 U.S. 123, 128-136 (*Bruton*).) Such a confession is so "powerfully incriminating," the doctrine provides, that the jury cannot be expected to heed the court's instruction and put it out of its collective mind when evaluating the defendant's guilt. (*Bruton*, at pp. 129, 135.) Thus, unless the codefendant testifies and is subject to cross-examination, the admission of the codefendant's unredacted confession at the joint trial violates the defendant's Sixth Amendment right to confront and cross-examine witnesses. (*Bruton*, at pp. 128-136; *Aranda*, at pp. 529-531.) Has the United States Supreme Court's subsequent narrowing of the Sixth Amendment right to confront and cross-examine witnesses to protect against only "testimonial" statements—as accomplished in *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*) and its progeny—also narrowed the *Aranda*/*Bruton* doctrine? We hold that the answer is "yes." We further hold that the admission of the codefendant's unredacted confession at a joint trial with an appropriate limiting instruction does not violate due process. In the unpublished portion of the opinion, we finally hold that severance of the trials in this case would not have been warranted. Consequently, we affirm defendant's murder conviction in this case.

# FACTS AND PROCEDURAL BACKGROUND

## I.  Facts

At almost midnight on a Saturday night in November 2014, Michael Shane Washington (defendant) walked into the Avalon Gardens housing complex in Los Angeles, knocked on the door of an apartment, asked the 20-year-old man who answered, "Where you from?," and when the man responded, "Avalon," defendant shot him through the chest and killed him.

Defendant was at the time a member of the 89 Family Swans street gang, which is affiliated with the Bloods street gang.  The Avalon Gardens Crips gang claimed the Avalon Gardens housing complex as its territory, and the victim's response to defendant's question indicated that the victim was aligned with the Avalon Gardens Crips street gang.  The 89 Family Swans and the Avalon Gardens Crips are rivals.

Four months before the shooting, defendant posted on his Facebook account, "On bl89d"—"blood" using an "89" instead of "oo"—"ima have to kill a nigga."

Defendant was with two others, Keon Scott (Scott) and Kevin Kendricks (Kendricks), at the time of the shooting.  Scott and Kendricks were members of the West Side Piru street gang, which is a Bloods street gang allied with the 89 Family Swans.

Defendant was arrested minutes after the shooting fleeing from the Avalon Gardens housing complex.  He was wearing red shorts, a color affiliated with the Bloods street gang.  He was also carrying a gun with cartridges that matched the cartridge found near the victim's body.  When questioned by police after his arrest, defendant told the police that he traveled to Los Angeles that day to meet a girl he met over the Internet, that he found the gun police recovered from him somewhere near the girl's

house, that he had never been to the Avalon Gardens housing complex, and that he did not know Scott or Kendricks.

Scott and Kendricks were also arrested soon after the shooting and were placed in the same jail cell along with a hidden recording device. During the 55 hours they were in the cell, they made several statements implicating themselves and defendant in the shooting: At one point, Kendricks said, "That nigga said, [']Blood, where you from?['] He said, "[']I'm from'" either "'Outlaw'" or "'Avalon'"; in another exchange, Scott asked, "Did you even see where he hit him though?" and Kendricks responded, "In the chest." Scott commented, "like I ain't trying to throw Shaggy under the bus like that, but he threw his self [*sic*] under the bus." Defendant goes by the name "Shaggy."

## II.    Procedural Background

The People charged defendant, Scott, and Kendricks with murder (Pen. Code, § 187, subd. (a)).[1] The People further alleged that defendant personally discharged a firearm causing death or great bodily injury (§ 12022.53, subd. (d)), and that the murder had been committed for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subds. (b)(1)(C) & (b)(5)). The People additionally alleged that defendant had served a prior prison term for his 2012 assault with a deadly weapon conviction (§ 667.5, subd. (b)).

The trial court admitted snippets of the jailhouse recordings of Scott's and Kendricks's conversations, but only against Scott and Kendricks; the court expressly instructed the jury not to consider the recordings against defendant.

---

[1]    All further statutory references are to the Penal Code unless otherwise indicated.

4

Defendant took the stand in his own defense. Contradicting his postarrest statement, defendant testified that he had traveled to Los Angeles with Scott and Kendricks to see if he could stay with his cousin; that he brought the gun with him; that the three of them went to the Avalon Gardens housing complex to buy marijuana; that a 20-year-old man was on one apartment's porch and, when he saw defendant, asked, "Where you from?"; that the 20-year-old man became "very aggressive" when Scott and Kendricks rounded a corner and came into view; and that defendant responded by firing off a single shot in a random direction as he fled.

The court instructed the jury on first and second degree murder, on voluntary manslaughter due to imperfect self-defense, and on perfect self-defense.

The jury convicted defendant of first degree murder and found true all of the firearm and gang allegations.[2]

The trial court sentenced defendant to prison for 51 years to life. The court imposed a base sentence of 25 years to life for first degree murder, plus an additional 25 years to life for the firearm enhancement, plus one additional year for the prior prison term.

Defendant filed a timely notice of appeal.

## DISCUSSION

Defendant argues that his trial counsel was constitutionally ineffective for not moving to sever defendant's trial from that of his codefendants Scott and Kendricks. We independently review claims of ineffective assistance. (*People v. Mayfield* (1993) 5 Cal.4th 142, 199.)

---

[2] The jury was unable to reach verdicts on Scott or Kendricks. Neither Scott nor Kendricks is part of this appeal.

To establish that counsel was constitutionally ineffective, a criminal defendant must show that (1) counsel's performance was "deficient" because it "'""fell below an objective standard of reasonableness . . . under prevailing professional norms"'"""; and (2) but for that deficient performance, there is a "reasonable probability . . . the outcome of the proceeding would have been different." (*People v. Mickel* (2016) 2 Cal.5th 181, 198, citing *Strickland v. Washington* (1984) 466 U.S. 668, 687-692.) It is especially "difficult" to prove ineffective assistance "on direct appeal" because courts "presum[e] that counsel's actions" are reasonable and because the "record on appeal may not explain why counsel chose to act as he or she did." (*Mickel*, at p. 198.) Because the decision not to make a meritless request is neither deficient performance nor prejudicial (*People v. Lucero* (2000) 23 Cal.4th 692, 732 ["'[c]ounsel may not be deemed incompetent for failure to make meritless objections'"]), defendant's ineffective assistance claim turns on whether a request for severance would have been well taken and, thus, on whether defendant was entitled to severance in the first place.

Defendant seems to suggest he was entitled to severance (1) under the *Aranda/Bruton* doctrine, (2) as a matter of due process, and (3) under section 1098, the statute governing severance. We review defendant's first two claims de novo because they turn on questions of constitutional interpretation. (*In re Taylor* (2015) 60 Cal.4th 1019, 1035.) We review defendant's third claim for an abuse of discretion. (*People v. Jackson* (2016) 1 Cal.5th 269, 298-299.)

## I. The *Aranda/Bruton* Doctrine

As a "general rule," courts presume that juries can and will dutifully follow the instructions they are given, including

6

instructions that limit a jury's consideration of evidence for certain purposes or against certain parties.  (*Richardson v. Marsh* (1987) 481 U.S. 200, 208, 211 (*Richardson*); *Francis v. Franklin* (1985) 471 U.S. 307, 324-325, fn. 9; *People v. Winbush* (2017) 2 Cal.5th 402, 457 (*Winbush*).)  In a handful of "extraordinary situations," however, courts have recognized "narrow exception[s]" to the general rule.  (*Richardson*, at p. 207; *Francis*, at pp. 324-325, fn. 9.)

One of those narrow exceptions is designed to protect (and thereby honor) a criminal defendant's Sixth Amendment right to confront and cross-examine witnesses.  (*Bruton*, *supra*, 391 U.S. at p. 137.)  The Sixth Amendment secures a defendant's right, "[i]n all criminal prosecutions . . . [,] to be confronted with the witnesses against him" (U.S. Const., 6th amend.), and "the right of cross-examination is included in the right . . . to confront . . . witnesses" (*Pointer v. Texas* (1965) 380 U.S. 400, 404).  If, in a joint trial, the jury is allowed to hear a codefendant's confession directly implicating the defendant but the codefendant does not take the witness stand, then the defendant cannot cross-examine the codefendant due to the codefendant's privilege against self-incrimination.  (*Richardson*, *supra*, 481 U.S. at p. 206.)  Although, in theory, an instruction telling the jury not to consider the codefendant's confession against the defendant would obviate any Sixth Amendment violation because "a witness whose testimony is introduced at a joint trial is not considered to be a witness 'against' a defendant if the jury is instructed to consider that testimony only against a codefendant" (*ibid.*), courts view a codefendant's confession directly implicating a defendant as such "powerfully incriminating" evidence that jurors are deemed incapable of

"'put[ting it] out of their minds'" even when given an instruction to do so (*Bruton*, *supra*, 391 U.S. at pp. 129, 135; accord, *People v. Lewis* (2008) 43 Cal.4th 415, 453, overruled on other grounds by *People v. Black* (2014) 58 Cal.4th 912, 919-920).

As a result, a trial court faced with a prosecutor's request to admit a codefendant's confession at a joint trial must resort to other options beyond a limiting instruction, such as (1) redacting the codefendant's confession in a way that both omits the defendant but does not prejudice the codefendant (*Aranda*, *supra*, 63 Cal.2d at p. 530; *Richardson*, *supra*, 481 U.S. at pp. 201-202; cf. *Gray v. Maryland* (1998) 523 U.S. 185, 189-190 [simply using "deleted" in place of defendant's name insufficient]); (2) severing the trial or using separate juries for each defendant (*Aranda*, at p. 530; *Gray*, at p. 192); or (3) excluding the evidence altogether (*Aranda*, at p. 530).

The *Aranda*/*Bruton* doctrine rests exclusively on the Sixth Amendment. *Bruton* itself is grounded on the confrontation clause alone. (*Bruton*, *supra*, 391 U.S. at pp. 136-137.) *Aranda* itself did not view its rule "as constitutionally compelled," but rather as a "judicially declared rule[] of practice to implement section 1098." (*Aranda*, *supra*, 63 Cal.2d at p. 530; accord, *People v. Anderson* (1987) 43 Cal.3d 1104, 1121 [noting that *Aranda* court "declined to rest on constitutional grounds"], superseded on other grounds by § 190.2, subds. (c) & (d).) However, the voters' enactment in 1982 of the "truth-in-evidence" provision of Proposition 8 overturned all judicially crafted exclusionary rules not compelled by federal constitutional law and, in so doing, abrogated *Aranda*. (Cal. Const., art. I, § 28, subd. (d); *People v. Fletcher* (1996) 13 Cal.4th 451, 465; *People v. Capistrano* (2014) 59 Cal.4th 830, 868, fn. 10.) Both *Bruton* and *Aranda* flirted with

8

the notion that admitting a codefendant's confession under these circumstances might be a denial of due process, but neither case ultimately relied upon due process. (*Bruton*, at p. 130; *Aranda*, at p. 530.)

The Sixth Amendment right to confront and cross-examine witnesses has evolved since the *Aranda/Bruton* doctrine came into being. For many years, the confrontation clause barred the admission of any out-of-court statement admitted for its truth if the hearsay declarant was not available for cross-examination, unless the statement bore "adequate 'indicia of reliability'"—that is, unless (1) the evidence fell within a "firmly rooted hearsay exception," or (2) the evidence otherwise had "particularized guarantees of trustworthiness." (*Ohio v. Roberts* (1980) 448 U.S. 56, 66, overruled by *Crawford*, *supra*, 541 U.S. 36.) In 2004, *Crawford* dramatically reshaped the confrontation clause: It narrowed the clause's reach from *all* out-of-court statements admitted for their truth to only those out-of-court statements that qualify as "testimonial," but completely barred the admission of such testimonial statements—irrespective of their reliability—absent the defendant's current or prior opportunity to cross-examine the declarant. (*Crawford*, at pp. 51, 53-54.) Although *Crawford* itself defined "testimonial" statements as the clause's "core concern[]" but held open the possibility that the clause might still apply to "nontestimonial" statements (*id.* at pp. 51, 68), the Court in subsequent cases held that testimonial statements "mark out not merely [the clause's] 'core,' but [also] its perimeter" (*Davis v. Washington* (2006) 547 U.S. 813, 824 (*Davis*)), and thus definitively held that clause "has no application" to nontestimonial statements (*Whorton v. Bockting* (2007) 549 U.S. 406, 420; *Davis*, at p. 821).

The jailhouse conversation between Scott and Kendricks qualifies as nontestimonial under *Crawford* and its progeny. Whether an out-of-court statement is testimonial turns on whether the "objective evidence" indicates that the statement was obtained for the "primary purpose" of "establish[ing] or prov[ing] past events potentially relevant to later criminal prosecution." (*Davis*, *supra*, 547 U.S. at p. 822; *Michigan v. Bryant* (2011) 562 U.S. 344, 356-357, 367.) Under this definition, "statements from one prisoner to another" or "made unwittingly to a [g]overnment informant" are not testimonial. (*Davis*, p. 825; *People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1214 ["Private communications between inmates are not testimonial"]; see also *People v. Arauz* (2012) 210 Cal.App.4th 1394, 1402.) Scott's and Kendricks's jailhouse conversation is not testimonial under *Crawford*, as defendant concedes.

This case therefore squarely presents the question: Did *Crawford'*s narrowing the reach of the confrontation clause have the effect of narrowing the reach of the *Aranda/Bruton* doctrine?

Defendant strenuously argues *Crawford* did not. Specifically, he asserts that a codefendant's confession that directly implicates a defendant is just as "powerfully incriminating"—and, thus, is just as difficult for a jury to put out of its mind notwithstanding an instruction to do so—regardless of whether that confession qualifies as testimonial or nontestimonial under *Crawford*. Drawing such a distinction, defendant reasons, is "illogical."

This argument is not without persuasive force, but ultimately lacks merit because the *Aranda/Bruton* doctrine is grounded exclusively in the confrontation clause and can extend no farther than the metes and bounds of the clause defined by the

10

United States Supreme Court.  (*U.S. v. Berrios* (3d Cir. 2012) 676 F.3d 118, 128 ["*Bruton* is no more than a by-product of the Confrontation Clause"]; *U.S. v. Johnson* (6th Cir. 2009) 581 F.3d 320, 326 [noting that "the *Bruton* rule" "is premised on the Confrontation Clause"].)  This is the analysis adopted by the only other published California case on this issue (*People v. Arceo* (2011) 195 Cal.App.4th 556, 575) as well as by the majority of the federal circuit courts.  (*U.S. v. Figueroa-Cartagena* (1st Cir. 2010) 612 F.3d 69, 85; *U.S. v. Williams* (2d Cir. 2007) 506 F.3d 151, 156; *U.S. v. Berrios*, at pp. 128-129 [overruling *U.S. v. Mussare* (3d Cir. 2005) 405 F.3d 161, 168]; *U.S. v. Dargan* (4th Cir. 2013) 738 F.3d 643, 651; *U.S. v. Vasquez* (5th Cir. 2014) 766 F.3d 373, 378-379; *U.S. v. Johnson*, at p. 326; *U.S. v. Dale* (8th Cir. 2010) 614 F.3d 942, 958-959; *U.S. v. Clark* (10th Cir. 2013) 717 F.3d 790, 815-816; cf. *Adamson v. Cathel* (3d Cir. 2011) 633 F.3d 248, 258-259 [applying pre-*Crawford* law].)  We add our voice to this chorus, and reject defendant's confrontation clause-based argument.

## II.    Due Process

The *Aranda*/*Bruton* doctrine is not the only "extraordinary situation[]" in which a jury is deemed incapable of adhering to a jury instruction directing the jury to put evidence out of its collective mind.  In *Jackson v. Denno* (1964) 378 U.S. 368, 379-391 (*Jackson*), the United States Supreme Court held that New York's procedure that allowed a jury to determine whether a defendant's confession was involuntary and, if it so determined, required the trial court to instruct the very same jury to disregard the confession while considering the defendant's guilt, violated due process.  "If [the jury] finds the confession involuntary," the Court reasoned, "does the jury—indeed, can it—

11

then disregard the confession in accordance with its instructions?" (*Id.* at p. 388.) Both *Aranda* and *Bruton* found *Jackson* to be a helpful analogy when they were constructing what would become the *Aranda*/*Bruton* doctrine: "If it is a denial of due process to rely on a jury's presumed ability to disregard an involuntary confession [in *Jackson*]," both cases noted, "it may also be a denial of due process to rely on a jury's presumed ability to disregard a codefendant's confession implicating another defendant when it is determining that defendant's guilt or innocence." (*Bruton*, *supra*, 391 U.S. at p. 130; *Aranda*, *supra*, 63 Cal.2d at pp. 528-529.)

Although, as noted above, neither *Aranda* nor *Bruton* ultimately relied upon due process as the basis for the rule they announced, defendant invites us to fashion a due process-based *Aranda*/*Bruton* doctrine. We respectfully decline this invitation, and do so for four reasons.

First, doing so would, in effect, breathe life back into the *Aranda*/*Bruton* doctrine when the codefendant's confession is nontestimonial. This would put us at odds with the weight of California and federal authority, discussed above, that has held to the contrary.

Second, redesignating the *Aranda*/*Bruton* doctrine—at least as applied to nontestimonial statements—as a due process-based doctrine instead of a confrontation clause-based doctrine would run afoul of the general maxim of constitutional jurisprudence that "[w]here a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." (*Albright v. Oliver* (1994)

12

510 U.S. 266, 273, quoting *Graham v. Connor* (1989) 490 U.S. 386, 395; see also *Portuondo v. Agard* (2000) 529 U.S. 61, 74.) Although these cases speak to substantive due process, the maxim they embody would seem to apply with equal force to preclude the recognition of a procedural due process right when a "particular Amendment" already speaks to—and rejects—a procedural protection. That is the case here. (Accord, *People v. Garcia* (2008) 168 Cal.App.4th 261, 280 ["the determination of whether the defendant was denied due process generally centers on whether the admission violated the defendant's rights under . . . *Aranda* . . . and *Bruton*"].)

Third, the danger posed by a jury's consideration of nontestimonial statements is ostensibly less severe than the danger posed by a jury's consideration of an involuntary confession in *Jackson*. Involuntary confessions are by definition coerced and thus "inherent[ly] untrustworth[y]." (*Jackson*, *supra*, 378 U.S. at p. 383.) A jury that does not heed an instruction to ignore such a confession will be considering evidence that is unreliable. By contrast, statements that are nontestimonial— and especially ones like the jailhouse conversation between Scott and Kendricks in this case—are, by definition, more likely to be trustworthy because "conversations . . . between friends in a noncoercive setting" are more likely to "foster[] uninhibited"— and hence, reliable—"disclosures." (*People v. Greenberger* (1997) 58 Cal.App.4th 298, 335 (*Greenberger*); *People v. Cervantes* (2004) 118 Cal.App.4th 162, 175 (*Cervantes*) [same]; cf. *People v. Duarte* (2000) 24 Cal.4th 603, 617 (*Duarte*) [statements "made to police shortly after" arrest less likely to be trustworthy].) Because due process is often concerned with safeguarding the reliability of evidence (e.g., *Perry v. New Hampshire* (2012) 565 U.S. 228, 240-

241 [noting that "reliability is the linchpin of admissibility under the Due Process Clause"]; *White v. Illinois* (1992) 502 U.S. 346, 363-364 ["Reliability is more properly a due process concern"]), the diminished risk of the jury's exposure to unreliable evidence in the context of nontestimonial statements counsels against the wholesale importation of *Jackson'*s due process concerns into this context.

Lastly, both the United States and California Supreme Courts have stopped short of ruling that due process bars a jury's exposure to a codefendant's confession directly implicating the defendant notwithstanding a jury instruction to the contrary. We are reluctant to take a step that neither of these two Courts has yet to take.

## III.   Severance Under Section 1098

When "two or more defendants are jointly charged with any public offense," "they must be tried jointly[] unless the [trial] court order[s] separate trials" through severance. (§ 1098.) The preference for joint trials is a "strong" one (*Winbush, supra,* 2 Cal.5th at p. 455), and rests upon considerations of judicial economy as well as a desire not to subject victims and witnesses to the "inconvenience (and sometimes trauma)" of having to testify in multiple trials (*Richardson, supra*, 481 U.S. at pp. 209-210; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 40 (*Coffman and Marlow*)).

Where, as here, "'defendants are charged with having committed "common crimes involving common events and victims," . . . the court is presented with a "'classic case'" for a joint trial.'" (*Winbush, supra*, 2 Cal.5th at p. 456, quoting *People v. Keenan* (1988) 46 Cal.3d 478, 499-500.) Our Supreme Court has set forth two alternative tests for evaluating whether

14

severance may nevertheless be appropriate. Under the first test, a trial court is to evaluate whether one or more of the following dangers exists: "'[1] an incriminating confession, [2] prejudicial association with codefendants, [3] likely confusion resulting from evidence on multiple counts, [4] conflicting defenses, or [5] the possibility that at a separate trial a codefendant would give exonerating testimony.'" (*Coffman and Marlow*, *supra*, 34 Cal.4th at p. 40, quoting *People v. Massie* (1967) 66 Cal.2d 899, 917; *People v. Souza* (2012) 54 Cal.4th 90, 109.) Under the second test, the court is to ask whether "'there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.' [Citation.]" (*Coffman and Marlow*, at p. 40; *Souza*, at p. 109.) The denial of severance warrants reversal only if (1) the trial court was wrong to deny severance at the time it was requested, and "it is reasonably probable the defendant would have obtained a more favorable result at a separate trial"; or (2) the trial court was right to deny severance at the time it was requested, but subsequent events reveal that the joint trial "'resulted in "gross unfairness" amounting to a denial of due process.'" (*People v. Burney* (2009) 47 Cal.4th 203, 237 (*Burney*).)

The trial court would not have abused its discretion had it denied severance of defendant's trial under either applicable test. Under the first multifactor test, only the first factor—an incriminating confession—counsels in favor of severance. However, the admission of a codefendant's "extrajudicial statement[] implicating [the defendant]" does not dictate severance where the defendant's confrontation clause rights are not otherwise violated (*Coffman and Marlow*, *supra*, 34 Cal.4th

15

at p. 43), and for the reasons described above, here they were not. The remaining factors do not favor severance because defendant's association with Scott and Kendricks was not longstanding and was not prejudicial to defendant (because defendant was the shooter), there were not multiple counts, defendant's defense of self-defense did not conflict with Scott's or Kendricks's defenses that defendant acted on his own, and there is nothing to suggest Scott or Kendricks would have given exonerating testimony to support defendant. Under the second test, the joint trial did not compromise defendant's confrontation clause rights because the *Aranda/Bruton* doctrine does not apply here; nor did the joint trial prevent the jury from making a reliable judgment about guilt or innocence because, as described above, the surreptitiously recorded jailhouse conversation did not produce unreliable evidence. What is more, the trial court expressly instructed the jury to consider the evidence against each defendant separately, and we presume that the jury followed that instruction. (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 152.)

Even if we assume that a timely motion by defense counsel to sever the trial would have been well taken, reversal is not warranted—and counsel's deficiency was not prejudicial— because, as noted above, there was no due process violation and because it is not "reasonably probable the defendant would have obtained a more favorable result at a separate trial." (*Burney*, *supra*, 47 Cal.4th at p. 237.) Defendant testified that he shot the victim, and it is not reasonably probable that the jury would have accepted his proffered defenses of perfect or imperfect self-defense had he been tried alone (and the snippets from the jailhouse conversation between Scott and Kendricks been absent

16

from that trial). Defendant was an active 89 Family Swans gang member who had boasted, "ima have to kill a nigga" months before walking into a rival gang's territory—wearing his gang colors—and confronting his victim with a gang challenge. The fact that defendant bolted and then lied to police with a story that bore no resemblance to his trial testimony only reinforces this conclusion. Even if defendant had not elected to testify, it is unlikely the defenses of perfect and imperfect self-defense would have been available, and defendant's postarrest statement was refuted by video footage from the Avalon Gardens housing complex showing him striding into the complex with Scott and Kendricks in tow.

Additionally, a separate trial would not have yielded a different result for the simple reason that the jailhouse conversation between Scott and Kendricks would have been admissible against defendant at his separate trial anyway. That is because the conversation is admissible as a declaration against interest. This exception to the hearsay rule applies if (1) "the declarant is unavailable," (2) "the declaration was against the declarant's penal interest when made," and (3) "the declaration was sufficiently reliable to warrant admission despite its hearsay character." (*Duarte, supra*, 24 Cal.4th at pp. 610-611; *People v. Lawley* (2002) 27 Cal.4th 102, 153.) To satisfy the third element, the statement must be "'truly self-inculpatory, rather than merely [an] attempt[] to shift blame or curry favor.'" (*Duarte*, at pp. 611-612, quoting *Williamson v. United States* (1994) 512 U.S. 594, 603.) In this case, Scott and Kendricks were unavailable to testify by virtue of their privilege against self-incrimination. (Evid. Code, § 930.) Their statements recounting what defendant said to the victim, where the defendant shot the

17

victim, and that defendant "threw his self [*sic*] under the bus" are incriminating to Scott and Kendricks because those statements place them with defendant during the shooting and support a finding that they aided and abetted the charged murder. Lastly, and as discussed more fully above, their statements were made to one another without any knowledge they were being recorded; as such, they are more reliable. (*Greenberger*, *supra*, 58 Cal.App.4th at p. 335; *Cervantes*, *supra*, 118 Cal.App.4th at p. 175.) Because a declaration against penal interest is admissible against all defendants if admissible against any one (*Greenberger*, at pp. 314, 334; *Cervantes*, at p. 177), the jailhouse conversation was admissible against defendant as well.

Defendant makes two arguments resisting this analysis. First, he argues that we may not evaluate whether the jailhouse conversation is admissible against him because the People conceded before the trial court that the conversation was admissible only against Scott and Kendricks. However, we may affirm a conviction on any ground supported by the record, whether or not the trial court relied upon it. (*People v. Chism* (2014) 58 Cal.4th 1266, 1295, fn. 12). Defendant cites *People v. Grimes* (2016) 1 Cal.5th 698, 720-721, for the contrary proposition, but that case dealt with forfeiture of issues on appeal, not before the trial court. Second, defendant asserts that the United States Supreme Court in *Lilly v. Virginia* (1999) 527 U.S. 116, held that declarations against penal interest did not constitute a "firmly rooted hearsay exception" under pre-*Crawford* confrontation clause law. This is true, but irrelevant to the applicability to the hearsay exception for declarations against penal interest under state law.

18

## DISPOSITION

The judgment is affirmed.

CERTIFIED FOR PARTIAL PUBLICATION.


_____, J.

HOFFSTADT

We concur:


_____, Acting P. J.

ASHMANN-GERST


_____, J.*

GOODMAN

---

\*      Retired judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.