PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-2883
_____

JAMES WASHINGTON

v.

SECRETARY PENNSYLVANIA
DEPARTMENT OF CORRECTIONS;
THE DISTRICT ATTORNEY OF
THE COUNTY OF PHILADELPHIA;
THE ATTORNEY GENERAL OF
THE STATE OF PENNSYLVANIA,

Appellants
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2-10-cv-02869)
District Judge:  Honorable Eduardo C. Robreno
_____

Argued May 15, 2013
Before:  SMITH, FISHER and CHAGARES, *Circuit Judges*.

(Filed: August 9, 2013)

Susan E. Affronti, Esq. (ARGUED)
Thomas W. Dolgenos, Esq.
Philadelphia County Office of District Attorney
3 South Penn Square
Philadelphia, PA  19107
        *Counsel for Appellants*

Amy Coleman (ARGUED)
Adrian N. Roe, Esq.
Charles P. Sapienza, III (ARGUED)
Duquesne University School of Law
632 Fisher Hall
600 Forbes Avenue
Pittsburgh, PA  15282
        *Counsel for Appellee*

_____

OPINION OF THE COURT
_____

FISHER, *Circuit Judge*.

This appeal arises out of James Washington's collateral attack on his convictions for second-degree murder, robbery, and criminal conspiracy related to his participation as the driver in a February 2000 store robbery that resulted in the deaths of two store employees.  Washington contends that the introduction into evidence of a jointly-tried nontestifying coconspirator's confession violated his rights under the Confrontation Clause when the redacted confession replaced

2

Washington's name with "someone I know" or "the driver." A jury found Washington guilty, and Washington pursued all available direct and collateral state appeals before petitioning the District Court for a writ of habeas corpus. The District Court conditionally granted the writ. *Washington v. Beard*, 867 F. Supp. 2d 701, 703 (E.D. Pa. 2012). Because no reasonable reading of the Supreme Court's Confrontation Clause jurisprudence would permit the introduction of the redacted confession allowed in this case, we will affirm.

## I.

## A.

At trial, the Commonwealth introduced evidence establishing that James Taylor, one of Washington's friends, was hired as a stockperson at a Dollar Express Store in Philadelphia in January 2000. Taylor observed that manager Gertrude Ritterson routinely arrived at the store at 5:00 a.m. and she would regularly smoke a cigarette on the back of the loading dock with the garage door open half-way before attending to her duties. Taylor also noted that the store contained a safe in the office and employed no guards, video cameras, or other security measures – making it an "easy target" for his friends Washington, Willie Johnson, and Romont Waddy to rob.

On the night of February 23, 2000, the four men met at Waddy's home to plan the robbery, which they intended to carry out the next day. Johnson carried the gun they planned to use. In the morning, Washington drove the group to the store. Washington and Taylor remained in the car while

3

Waddy and Johnson entered, carrying tools needed to open a safe. Waddy and Johnson confronted Ritterson and another employee. Johnson then fired bullets through the heads of Ritterson and the other employee.

Washington heard the shots and ran into the store, where he helped remove $750 from the safe. Waddy filled a trash bag with items from the store to sell. Washington, Johnson, and Waddy then returned to the car, where Taylor asked why they had shot the employees. Johnson complained about the small amount of money collected from the store and handed $50 to Waddy and $200 to Washington. Taylor did not take any of the money.

Shortly after the incident, Taylor learned that the police had designated him a person of interest. He surrendered to police and gave a statement. He also agreed to testify against the other men in exchange for a sentence of 55 to 110 years' imprisonment. Additionally, Waddy gave a statement to police on March 5, 2000.

B.

Johnson, Waddy, and Washington were tried together before a jury in the Court of Common Pleas of Philadelphia County in October and November 2001. Taylor's testimony at trial on October 25, 2001 identified all of the coconspirators and discussed in detail their roles in the crime. Taylor clearly and repeatedly identified Washington as the driver of the car:

4

"Q: What was Jiz [a nickname for Washington] or James Washington to do?

A: Just to drive.

Q: Why was that?

A: Because he was the only one with a car.

. . .

A: Willie sat in the front, I sat in back of Willie, Romont sat back of Jiz, Jiz was the driver."

App. at 179, 181. On cross-examination, Washington's counsel pointed out significant inconsistencies in Taylor's story, as well as Taylor's history of drug and alcohol abuse and admittedly heavy impairment from drugs at the time of the incident.

On October 29, the jury heard a redacted version of Waddy's confession, relayed to them as part of the testimony of Detective John Cummings. Over Washington's objection[1] that the redaction transparently referred to Washington, the

---

[1] After Taylor's testimony and before the reading of Waddy's confession, Washington's trial counsel stated in an objection to the redaction that Washington was "the only person that's been identified as the driver. I think it's tantamount to using his name." App. at 238.

5

trial judge gave a limiting instruction[2] and then allowed the detective read the redacted statement in response to questions from the prosecutor.[3] The jury never saw the original or the redacted copy. Cummings's reading deleted all the names and nicknames of the defendants, which were replaced with

---

[2] The judge told the jury, "Ladies and gentlemen, the statement of Romont Waddy which was given to Detective Cummings on March 5th may soon be read to you. I caution you that you may consider the statement given by Mr. Waddy as evidence relating only to his guilt or non-guilt and not as evidence concerning the guilt or non-guilt of any other defendant." App. at 266.

[3] Officer Cummings's account of Waddy's questioning by police included:

"Question: How long have you know the driver of the car you were in.
Answer: For a long time, like ten years.
Question: I'm showing you a photo. Do you recognize this person.
Answer: Yes, that's the driver.
. . .
[Here, the testifying officer indicates that Waddy signed a photo of the driver.]
. . .
Question: Where does the driver live.
Answer: He was staying with his mom in Hill Creek."

App. at 270 (errors in the original).

words such as "someone I know," "the other guy," "the driver," "the guy who went into the store," and "the shooter." The statement contained no reference to Washington by name or nickname.

Washington argued before the jury that he could not be guilty because he had an alibi for the time of the robbery, which he contended he had spent visiting his father in the hospital. Conflicting evidence from the paramedics who had retrieved Washington's father at home to transport him to the hospital, neighbors, and other family members who had visited the hospital cast some doubt on the veracity of Washington's claims.

The jury found Washington guilty. The trial judge sentenced Washington to two consecutive life terms of imprisonment for the murders and a concurrent term of ten to twenty years' imprisonment for conspiracy. For sentencing purposes, the robbery conviction merged.

The Superior Court of Pennsylvania affirmed Washington's conviction on direct appeal, and the Supreme Court of Pennsylvania denied Washington's direct appeal. *Commonwealth v. Washington*, 832 A.2d 545 (Pa. Super. Ct. 2003), *cert. denied*, 847 A.2d 1285 (Pa. 2004). In January 2005, Washington challenged his convictions under the Pennsylvania Post Conviction Relief Act (PCRA), 42 Pa. Cons. Stat. Ann. § 9541, et seq., alleging ineffective assistance of counsel and various violations of his constitutional rights. The PCRA court denied his petition, and the Superior Court affirmed that decision. *Commonwealth v. Washington*, 981 A.2d 938 (Pa. Super. Ct.

2009). The Pennsylvania Supreme Court denied Washington's subsequent appeal. *Commonwealth v. Washington*, 995 A.2d 353 (Pa. 2010).

On June 14, 2010, Washington filed a federal habeas petition in the Eastern District of Pennsylvania, which was initially reviewed by Magistrate Judge Strawbridge. *Washington*, 867 F. Supp. 2d at 703. Judge Strawbridge recommended the denial of the petition on the merits. Before the District Court, Washington raised eleven objections to the Magistrate's Report and Recommendation. *Id.* at 705. The District Court sustained objection ten regarding Washington's rights under the Confrontation Clause and granted a conditional writ of habeas corpus. *Id.* at 709. The government appeals from that decision.

II.

The District Court had jurisdiction over Washington's collateral attack under 28 U.S.C. § 2254. We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291 and § 2253(a). Section 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214, gives substantial deference to state trial courts and limits habeas relief to those cases where the state court's conclusion was contrary to clearly established federal law as embodied in the holdings of the Supreme Court or was an unreasonable application of that law. *See Williams v. Taylor*, 529 U.S. 362, 399, 411 (2000) (noting clearly established federal law is made up of the Supreme Court's holdings, but not its dicta). We conduct plenary review of the District Court's legal conclusion that

8

the state court decision was an unreasonable application of federal law. *See Lambert v. Blackwell*, 387 F.3d 210, 231 (3d Cir. 2004). We presume that the factual findings of the Pennsylvania Superior Court are correct. *See Vazquez v. Wilson*, 550 F.3d 270, 276 (3d Cir. 2008). We perform an independent analysis as to the harm caused by the error rather than deferring to the state court's conclusion. *Bond v. Beard*, 539 F.3d 256, 276 (3d Cir. 2008).

## III.

Washington asked the District Court to set aside his convictions because evidence introduced at trial violated his Sixth Amendment right to confront his accuser. We conclude that the District Court properly granted Washington habeas relief because (A) the Pennsylvania Superior Court unreasonably applied clearly established federal law when it concluded that the trial court had properly admitted into evidence redacted nontestifying coconspirator testimony and (B) that error substantially and injuriously affected Washington's case.

## A.

AEDPA allows federal courts to grant relief from state court decisions that unreasonably apply federal law. *Williams*, 529 U.S. at 407. If "'fair-minded jurists could disagree' on the correctness of the state court's decision," federal habeas relief is precluded. *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)); *see also Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009) (quoting 28 U.S.C. § 2254(d)(1)) ("[I]t

9

is not 'an unreasonable application of' 'clearly established Federal law' for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme] Court."). When a rule is general rather than specific, courts have "more leeway" in making case-by-case determinations. *Yarborough*, 541 U.S. at 664. The District Court concluded that the Pennsylvania Superior Court had unreasonably applied clearly established federal law by drawing a bright-line rule that excluded from Confrontation Clause protection any confession that only becomes incriminating when linked to other evidence introduced at trial. *Washington*, 867 F. Supp. 2d at 707. We agree.

On the use of a nontestifying codefendant's statement incriminating another defendant, *Bruton v. United States*, 391 U.S. 123 (1968), *Richardson v. Marsh*, 481 U.S. 200 (1987), and *Gray v. Maryland*, 523 U.S. 185 (1998), lay out the federal law as articulated by the Supreme Court. *Bruton* held that a criminal defendant is deprived of his right to confrontation when a nontestifying codefendant's confession names him, regardless of whether the judge has given the jury a limiting instruction. 391 U.S. at 126. Although juries are generally presumed able to follow instructions about the applicability of the evidence, the Court in *Bruton* determined that a nontestifying codefendants' confession that names the defendant poses too great a risk that the jury will use the evidence to determine the guilt or non-guilt of someone other than the confessor. *Id*. at 135.

In *Richardson,* the Court applied *Bruton* to a codefendant's confession that had been redacted to eliminate any indication that anyone other than the speaker had

10

participated in the crime.  481 U.S. at 203.  The Court held that the introduction of a redacted nontestifying codefendant statement that eliminates "not only the defendant's name, but any reference to his or her existence" does not violate the Confrontation Clause because jurors are more likely to be able to follow a limiting instruction when "the confession was not incriminating on its face, and became so only when linked with evidence introduced later at trial" than they would be in cases like *Bruton* where the codefendant is facially implicated in the confession.  *Id.* at 208.

In *Gray*, the Court considered a redaction that replaced the defendant's name with a deletion mark and held that *obvious* deletions that alert the jury to a redaction violate the Confrontation Clause because they encourage jurors to speculate about the reference and are accusatory in a way similar enough to the direct implication in *Bruton* to merit the same result.  *See* 523 U.S. at 195 (quoting *Richardson*, 481 U.S. at 209) ("[T]he redacted confession with the blank prominent on its face, in *Richardson*'s words, 'facially incriminat[es]' the codefendant.  Like the confession in *Bruton* itself, the accusation that the redacted confession makes 'is more vivid than inferential incrimination, and hence more difficult to thrust out of mind.'").

The Superior Court opinion demonstrates that it recognized and considered the correct holdings of the Supreme Court in reaching its decision.  App. at 72-73. Nonetheless, we conclude that the Superior Court unreasonably applied those holdings to the facts of Washington's case because it ignored *Gray*'s admonition to look to the kind rather than the mere fact of inference.  As we

11

will explain, the result in this case – where the trial court allowed a redaction that was plainly transparent at the time the testimony was given – demonstrates the absurdity of a bright-line interpretation of *Richardson*.

In its brief discussion of the issue, the Superior Court held in this case that its previous precedent fully foreclosed Washington's claim that replacing his name with "someone I know" or "the driver" violated his rights under the Confrontation Clause. *See* App. at 72-73 (citing *Commonwealth v. Travers*, 768 A.2d 845 (Pa. 2001)). In *Travers*, the Pennsylvania Supreme Court held that a redaction referring to the codefendant as "the other man" did not offend the Confrontation Clause because it was not "powerfully incriminating on its face." 768 A.2d at 851. According to the *Travers* court, *Richardson* limited the *Bruton* rule and "expressly rejected the theory of contextual implication, recognizing the important distinction between co-defendant confessions that expressly incriminate the defendant and those that become incriminating only when linked to other evidence properly introduced at trial." *Travers*, 768 A.2d at 848. Consequently, the Superior Court explained that *Travers* disposed of Washington's claim because Washington's "identity was indeed only clarified by Taylor's testimony, a curative instruction was given, and the redaction of Waddy's statement was proper in and of itself." App. at 73.

The Commonwealth urges us to treat this case as one about the propriety of redactions that employ neutral pronouns and phrases, a method about which we and other Courts of Appeals have noted that the Supreme Court has

12

expressed no opinion. *Vazquez*, 550 F.3d at 279; *see also*, *e.g.*, *Spears v. Mullin*, 343 F.3d 1215, 1232 (10th Cir. 2003) (noting lack of Supreme Court guidance directly on point and upholding redaction wherein an officer paraphrased the codefendant statement, replacing names with "others" or "they"); *McGhee v. Yukins*, 229 F.3d 506, 512 (6th Cir. 2000); *United States v. Edwards*, 159 F.3d 1117, 1125 (8th Cir. 1998).

To that end, the Commonwealth argues that given the lack of explicit instruction from the Supreme Court, the differing decisions among the lower courts demonstrates that the Superior Court applied *Bruton* and its progeny within the range of reasonable opinions. *See Harrington*, 131 S. Ct. at 786. As evidence of the wide range of acceptable options, the government points to other Courts of Appeals that have interpreted *Gray* as permitting redactions (accompanied by a limiting instruction) that employ neutral pronouns and phrases. *See*, *e.g.*, *United States v. Lighty*, 616 F.3d 321, 376-79 (4th Cir. 2010) (approving redaction that replaced names with "three other people" because the confession itself gave no way to identify them); *United States v. Vasilakos*, 508 F.3d 401, 407 (6th Cir. 2007) (approving redaction with "another person" or "another individual"); *United States v. Logan*, 210 F.3d 820, 821-22 (8th Cir. 2000) (considering redaction without regard to other evidence and approving neutral-pronoun redactions). The Commonwealth also notes that *Gray* cited approvingly to Sixth and Second Circuit opinions that had approved redactions that replaced a codefendants name with "someone" and "all three of us." *See United States v. Garcia*, 836 F.2d 385 (8th Cir. 1987); *Clark v.*

13

*Maggio*, 737 F.2d 471 (5th Cir. 1984). Furthermore, the Commonwealth argues that the redaction of Waddy's statement is acceptable because *Gray* explicitly stated that "me and a few other guys" would be acceptable and, although the District Court expressed concern that the redaction made reference to Washington's role in the conspiracy, nothing in Supreme Court precedent specifically bans this practice. Other courts have approved similar alterations that make reference to roles. *See*, *e.g.*, *United States v. Green*, 648 F.3d 569, 575-76 (7th Cir. 2011) (approving the replacement of codefendant's name with "the strawbuyer," but noting that the redaction came "very close to the *Bruton* line"); *United States v. Yousef*, 327 F.3d 56, 149 (2d Cir. 2003) (approving the replacement of codefendant's name with "my neighbor").

We have no doubt that redactions replacing names with neutral pronouns and phrases will often fit comfortably within the range of acceptable approaches outlined by *Bruton*, *Richardson*, and *Gray*. This is not one of those cases. The Superior Court applied a blanket rule, derived from *Travers*, that any redaction that would require a juror to consider an additional piece of information outside the confession in order to identify the coconspirator being referred to automatically falls inside the realm of *Richardson.* This is not a reasonable view of the law.

In *Richardson*, the Supreme Court distinguished the redacted confession from the unredacted confession that had been used in *Bruton*, because the *Bruton* confession "had expressly implicated" the defendant and "at the time that confession was introduced there was not the slightest doubt that it would prove 'powerfully incriminating.'" 481 U.S. at

14

208 (quoting *Bruton*, 391 U.S. at 135). The *Richardson* confession, on the other hand, "was not incriminating on its face, and became so only when linked with evidence introduced later at trial." *Id.* The *Richardson* Court reasoned that:

> "w]here the necessity of such linkage is involved, it is a less valid generalization that the jury will not likely obey the instruction to disregard the evidence. Specific testimony that 'the defendant helped me commit the crime' is more vivid than inferential incrimination, and hence more difficult to thrust out of mind. Moreover, with regard to such an explicit statement the only issue is, plain and simply, whether the jury can possibly be expected to forget it in assessing the defendant's guilt; whereas with regard to inferential incrimination the judge's instruction may well be successful in dissuading the jury from entering onto the path of inference in the first place, so that there is no incrimination to forget. In short, while it may not always be simple for the members of a jury to obey the instruction that they disregard an incriminating inference, there does not exist the overwhelming probability of their inability to do so that is the foundation of *Bruton*'s exception to the general rule.
>
> Even more significantly, evidence requiring linkage differs from evidence incriminating on its face in the practical effects which application

15

of the *Bruton* exception would produce. If limited to facially incriminating confessions, *Bruton* can be complied with by redaction—a possibility suggested in that opinion itself. If extended to confessions incriminating by connection, not only is that not possible, but it is not even possible to predict the admissibility of a confession in advance of trial. The 'contextual implication' doctrine articulated by the Court of Appeals would presumably require the trial judge to assess at the end of each trial whether, in light of all of the evidence, a nontestifying codefendant's confession has been so 'powerfully incriminating' that a new, separate trial is required for the defendant. This obviously lends itself to manipulation by the defense—and even without manipulation will result in numerous mistrials and appeals."

*Id.* at 208-09 (internal citations omitted).

The *Gray* Court recognized, however, that this reasoning could not apply equally to all inferences. In distinguishing the case from *Richardson*, the Court examined the effect of redactions that incriminate inferentially:

"But inference pure and simple cannot make the critical difference, for if it did, then *Richardson* would also place outside *Bruton*'s scope confessions that use shortened first names, nicknames, descriptions as unique as the 'red-haired, bearded, one-eyed man-with-a-limp,'

16

and perhaps even full names of defendants who are always known by a nickname. This Court has assumed, however, that nicknames and specific descriptions fall inside, not outside, *Bruton*'s protection. . . . *Richardson* must depend in significant part upon the *kind* of, not the simple *fact* of, inference. *Richardson*'s inferences involved statements that did not refer directly to the defendant himself and which became incriminating 'only when linked with evidence introduced later at trial.' The inferences at issue here involve statements that, despite redaction, obviously refer directly to someone, often obviously the defendant, and which involve inferences that a jury ordinarily could make immediately, even were the confession the very first item introduced at trial."

523 U.S. at 195-96 (citations omitted).[4]

---

[4] We reject the assertion that this reasoning represents non-binding dicta that cannot constitute clearly established federal law. *See Williams v. Taylor*, 529 U.S. 362, 399, 411 (2000) (clearly established federal law includes the Supreme Court's holdings, but not its dicta); *see also Kastigar v. United States*, 406 U.S. 441, 454-55 (1972) ("[B]road language" that was "unnecessary to the Court's decision . . . cannot be considered binding authority."). Distinguishing *Richardson* was necessary and central to the result in *Gray v. Maryland*, 523 U.S. 185, 195-96 (1998).

17

The Commonwealth urges us to read *Gray* narrowly and avoid looking at "all the evidence admitted at trial" because *Gray* was simply disapproving the kind of inferences required to link Kevin Gray to the word "deleted." Here, the Commonwealth misstates the argument against it. In fact, we need not look at "all the evidence," which would require trial courts to somehow look ahead through future testimony in order to make a *Bruton* ruling. The question here turns on what information was available to the trial court before it overruled Washington's objection, instructed the jury, and allowed Detective Cummings to read Waddy's confession. Taylor had already testified four days earlier, naming Washington as "the driver."[5] It should have been apparent "at the time that confession was introduced there was not the slightest doubt that it would prove powerfully incriminating." *Richardson*, 481 U.S. at 208. The problems with Waddy's confession were immediately obvious before the jury heard the statement and did not become so only "when linked with evidence introduced *later* at trial." *Id.* (emphasis added).

The problem with Waddy's confession becomes more apparent upon consideration of how the inferences in these cases actually work. In *Gray*, the Court guarded against the negative conclusions jurors might draw from a blank or deletion marking, which would alert them to the fact that a redaction had occurred and raise suspicions that the change

---

[5] Taylor testified on October 25, and Detective Cummings read Waddy's statement to the jury on October 29. During the period between those days, the jury heard testimony for approximately three hours on October 26.

had been made to protect someone: the codefendant. But the Court also identified other kinds of inferences that would allow a jury to so easily connect a redaction with a particular person that the redaction would be tantamount to using the codefendant's name in violation of *Bruton*. For example, the Court specifically noted that physical descriptions would violate *Bruton*; after all, the jury would need to only look to counsel table to find someone who matched. But appearance, as the *Gray* dissent points out, is not "evidence" that would be included in *Richardson*'s admonition against considering "evidence introduced later at trial." *See* 523 U.S. at 201-02 (Scalia, J., dissenting) ("Since the defendant's appearance at counsel table is not evidence, the description 'red-haired, bearded, one-eyed man-with-a-limp,' would be facially incriminating – unless, of course, the defendant had dyed his hair black and shaved his beard before trial, and the prosecution introduced evidence concerning his former appearance.").

Nicknames, which the Court has assumed fall within the protection of *Bruton*, provide perhaps the best analogy to Washington's case. The connection between a defendant and a nickname (other than a simple shortening of a given name) requires extrinsic evidence to incriminate. Without that additional piece of information, a confession containing a nickname would not be incriminating. And, unlike physical appearance, the link often would be provided by "evidence." In this case, for example, Taylor testified both that Washington was "the driver" and that he went by the nickname "Jiz." Clearly, Supreme Court precedent would not permit a redaction that replaced Washington's name in

19

Waddy's confession with "Jiz." Given that "the Driver" and "Jiz" both incriminate Washington because of pieces of information that earlier testimony had made readily available to the judge and jury before Waddy's confession was admitted, there does not seem to be a principled distinction between a redaction that identifies Washington as "the driver" and one that refers to him as "Jiz."

The inference connecting the defendant and confession in *Richardson* worked differently. There, the confession gave no indication that Marsh was in the car as the coconspirators discussed the murder. 481 U.S. at 203-04. Later at trial, Marsh testified that she was in the car but did not hear the discussion. *Id.* Considering all the evidence, the jury could have concluded that Marsh knew in advance about the murder, since she had placed herself in the car, but that would require the jury to come to a number of conclusions from the facts – for example, that Marsh could not have been where she said she was and not have heard the conversation described in the confession.

We recognize that the *Gray* Court described the kind of inferences covered by *Bruton* as those that "a jury *ordinarily* could make immediately, even were the confession the very first item introduced at trial." 523 U.S. at 196 (emphasis added). Clearly, limiting the relevant inferences in this manner takes Taylor's testimony out of consideration. But this statement is best understood in light of the sentences that immediately follow, noting that such a limitation addresses the policy concerns raised in *Richardson* that allowing consideration of all the evidence would make it impossible for courts to know before a trial's conclusion

20

which redactions would be acceptable – effectively requiring the severance of all trials where this kind of confession would be introduced. That consideration is not relevant here, given that the trial judge had the needed information and could have ordered changes to the redaction based on Taylor's testimony before the jury heard Waddy's confession.

In sum, no reasonable reading of *Bruton*, *Richardson*, and *Gray* can tolerate a redaction that the trial judge knew at the time of introduction would be transparent to the jurors. Taylor's testimony clearly and explicitly identified Washington as the driver. Replacing Washington's name with "the driver" was, as counsel stated, tantamount to using Washington's name and cannot be allowed to stand, even in light of AEDPA's deferential standard of review.

While we recognize that only the holdings of the Supreme Court bind us in this posture, we note that this decision comports with our other recent opinions explaining the reasonable range of application of the Supreme Court's *Bruton* jurisprudence. In *Vazquez*, the redacted confession implicated two others in the crime, one of whom the confessor referred to as "[his] boy" and "the other guy." 550 F.3d at 274. Although we acknowledged that these terms might usually satisfy *Bruton*, we criticized the Pennsylvania court's categorical approval of neutral-pronoun redactions and held that "using a bright line is 'an unreasonable application of clearly established Federal law under the decisions of the Supreme Court of the United States' given the necessity of determining how strongly a codefendant's statement implicates the defendant and the likelihood that it would be disregarded by the jury." *Pabon v. Mahanoy*, 654

21

F.3d 385, 395 (3d Cir. 2011) (describing *Vazquez* and granting certificate of appealability on *Bruton* question).[6] Since the briefing began in this case, we have reaffirmed in *Eley v. Erickson* our view that the application of a bright-line rule to neutral redactions unreasonably applies federal law. *See* 712 F.3d 837, 861 (3d Cir. 2013). Although AEDPA demands that we look to Supreme Court precedent and not our own holdings in answering the Confrontation Clause question presented here, the reasoning we explained in *Vazquez* and *Eley* about the shorthand approach the

---

[6] The Commonwealth argues that *Vazquez*, to the extent that it explains how we have viewed Supreme Court precedent in the past, can be distinguished on its facts. In *Vazquez*, the trial court allowed the prosecutor to emphasize before the jury that the confessor had in fact identified the other men involved to police, making the facts that he had named names and that his statement had been redacted transparent in violation of *Gray*. *Vazquez v. Wilson*, 550 F.3d 270, 274-75 (3d Cir. 2008). Additionally, the prosecutor and a witness broke redaction during the trial. *Id.* The jury clearly drew inferences from the evidence and events at trial, as questions from the jury during deliberations revealed that they believed the statement referred to Vazquez as the shooter. Nonetheless, the Commonwealth misrepresents *Vazquez*'s holding. The *Vazquez* court specifically disclaimed that these facts had impacted its holding, noting that its decision was based on the record before the trial judge at the time the redacted confession was admitted and not on events that occurred later at trial. *Id.* at 277.

22

Pennsylvania Superior Court has taken in following *Travers* has equal application to this case. Clearly, neutral pronoun and phrase redactions will often meet the standards laid out in *Bruton*, *Richardson*, and *Gray*. But Washington's case presents some of the unusual circumstances where a facially neutral redaction cannot reasonably be viewed as satisfying the Confrontation Clause – illustrating how the bright-line rule adopted by the Superior Court proves inadequate to protect codefendants' rights. The course taken by the trial court posed an obvious and serious risk that the jury would, contrary to the instruction it received, weigh Waddy's confession in its determination of Washington's guilt or non-guilt. Therefore, despite the large measure of deference we owe to the state courts, we conclude that the Superior Court unreasonably applied clearly established federal law.

B.

Because the Pennsylvania Superior Court unreasonably applied clearly established federal law, we next consider whether the Confrontation Clause error had the "substantial and injurious effect" on Washington's case required to merit relief. *Fry v. Pliler*, 551 U.S. 112, 121-22 (2007). If we were to conclude that the error did not influence the jury or that it had "but very slight effect," we would uphold the judgment. *See Adamson v. Cathel*, 633 F.3d 248, 260 (3d Cir. 2011) (finding an error not substantially injurious where there was "overwhelming" evidence as to the crime itself, but not as to Adamson's involvement). But "grave doubt" about the effect of the error means "we must conclude that the error was not harmless." *Id.*; *see also Fry*, 551 U.S. at 121 n.3 (citing *O'Neal v.*

23

*McAninch*, 513 U.S. 432, 435 (1995)). We perform an independent analysis as to the harm caused by the error rather than deferring to the state court's conclusion. *Bond*, 539 F.3d at 276 (holding that error did not have a substantial and injurious effect where an independent eyewitness had identified petitioner and petitioner had confessed, though he later argued his confession was coerced).

The District Court concluded that the Confrontation Clause error substantially injured Washington because the only significant evidence against him came from Taylor's testimony. *Washington*, 867 F. Supp. 2d at 709. According to the District Court, Taylor's testimony suffered from substantial credibility problems, both because of his history of drug and alcohol abuse and because of his possible incentive as a participant in the crime to distort the story to his own benefit at trial. *Id.* Washington adds that Taylor lied repeatedly to police during questioning and in earlier judicial proceedings and analogizes his case to *Vazquez*, where we held that the *Bruton* violation had caused a substantial and injurious effect on the trial despite the existence of other, often contradictory, evidence at trial that implicated Vazquez beyond the coconspirator confession, including fingerprint evidence. *See Vazquez*, 550 F.3d at 282-83.

The Commonwealth offers several reasons why the redaction error cannot have caused a substantial and injurious effect. First, the Commonwealth argues that the error could not have been sufficiently consequential given the government's relatively light evidentiary burden: to convict Washington of second-degree murder, the government needed only to show that Washington took part in the robbery. *See*

18 Pa. Cons. Stat. § 2502(b). The Commonwealth describes Washington's complaint as having been identified as the driver and argues that this could have no impact because the government did not need to prove any particular role for him to be found guilty – only that he was involved in the robbery. This argument dramatically underplays the effect of Waddy's confession. At trial, Washington challenged the truthfulness of Taylor's statement and attempted to support this argument during cross-examination by identifying a number of reasons why the jury could question Taylor's truthfulness. Waddy's statement accusing "the driver" stood before the jury with no opportunity for rebuttal, providing corroboration for Taylor's claims without the liability of Taylor's drug use and impairment at the times of the events in question or his history of changing his story about the robbery.

Second, the Commonwealth argues that Waddy's statement cannot have had a substantial and injurious effect because Taylor's testimony standing alone provided all the evidence against Washington the government needed. Acknowledging some of the problems with Taylor's testimony, the Commonwealth maintains that Taylor's testimony alone still would have been dispositive because Taylor consistently stated Washington's role, despite changing on other issues, and provided sufficient evidence to meet the relatively low factual requirements of second-degree murder. Taylor's testimony about other issues, but not Washington's role, was corroborated by other witnesses.

The trial judge, in a ruling assessing the weight and sufficiency of the evidence after trial, called the evidence against Washington "credible and essentially uncontradicted."

25

App. at 84. The Commonwealth contends that this factual finding, to the extent that the evidence against Washington includes Taylor's testimony, binds us and should have prevented the District Court from basing its conclusion on the potential problems with Taylor's testimony that the jury could have identified. *See* 28 U.S.C. § 2254(e)(1) ("[A] determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."); *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983) ("28 U.S.C. § 2254(d) gives federal habeas courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them."). But AEDPA's high standard of deference does not apply to our analysis of the error's impact. *Bond*, 539 F.3d at 276. At Washington's trial, Taylor's credibility was an issue before the jury. Our task is to determine whether Waddy's confession had a substantial and injurious effect on the decision made *by the jury*. The trial court's determination post-trial that the evidence had been sufficient to convict is not the relevant consideration.

Finally, the Commonwealth contends that the error could not have substantially injured Washington because he provided a "weak" rebuttal of character evidence from family members and a "hopelessly contradictory" alibi. At trial, testimony from family members and the paramedics who brought Washington's father to the hospital presented conflicting timelines about when Washington was with his father. But the fact that Washington's alibi evidence may not have been conclusive does not ultimately answer the question

26

before us. The Commonwealth had the burden of proving Washington's guilt beyond a reasonable doubt, and Washington's trial strategy included raising doubts about the credibility of Taylor's testimony. Because of the way it was redacted, Waddy's confession undercut that effort by appearing to corroborate Taylor's evidence about "the driver."

Ultimately, Washington has shown enough of a probable impact on the jury to create "grave doubt" about the consequences of the Confrontation Clause error. *Adamson*, 633 F.3d at 260. We therefore conclude that the Superior Court erred on the Confrontation Clause issue and that such error was sufficiently injurious to warrant relief.

## IV.

For the foregoing reasons, we will affirm the June 7, 2012 order of the District Court. Consistent with that order, the Commonwealth of Pennsylvania shall either release or retry Washington within 120 days of entry of this order.[7]

---

[7] The Duquesne Law School Federal Practice Clinic ably represented Washington in this appeal. We thank the students and the law school for their service.

27