Filed 7/3/24  P. v. Hicks CA4/3

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G062746 |
| v. | (Super. Ct. No. RIF1800767) |
| KRYSTOFFER DEVION HICKS, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Riverside County, Timothy J. Hollenhorst, Judge.  Affirmed.

Crystal A. Morgan for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, A. Natasha Cortina and Alan L. Amann, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

Defendant Krystoffer Devion Hicks and the victim, L.W., were in an intimate relationship.  After an argument one evening in February 2018, Hicks returned to the home shared by Hicks, L.W., and their two children, and murdered her by stabbing her several times.  He was convicted of second degree murder (Pen. Code, § 187, subd. (a)),[1] with a finding that he personally used a deadly and dangerous weapon in the commission of the murder (§ 12022, subd. (b)(1)).  He was sentenced to 15 years to life followed by one year for the enhancement.

In this appeal, Hicks makes three claims.  First, he contends the trial court violated the Sixth Amendment's confrontation clause by admitting a video recording of an interview conducted with L.W.'s daughter, who was five years old at the time.  Hicks forfeited this issue by failing to raise it at trial.  Even if he had not forfeited this issue, because the daughter testified at trial, there was no violation of the confrontation clause, and admitting the video and transcript of that testimony into evidence, rather than simply playing it for the jury, was harmless error.  Second, he claims the court erroneously instructed the jury on the now abolished natural and probable consequences doctrine as a theory of murder.  Hicks is simply incorrect on this point, confusing the natural and probable consequences language in the definition of implied malice with the entirely separate and now abolished theory of murder.  Finally, he argues the court's instruction on prior acts of domestic violence as propensity evidence confused the jury and the court's comments following the instruction were incorrect.  We disagree and find no error.  Accordingly, we affirm the judgment.

---

[1] Subsequent statutory references are to the Penal Code unless otherwise indicated.

# I

# FACTS

At all times relevant, Hicks and L.W. were in a romantic relationship and lived together. L.W. had a daughter, A., from a previous relationship, and in 2017 she and Hicks had a son, K., together. Their relationship was described as "volatile. They loved each other. They argued and fought a lot." Their fights were sometimes physical. Hicks testified that L.W. used a knife to inflict a small cut on his face and on his hand during a fight while they lived in Nevada. On another occasion, he testified, she hit him with a bag while he was lying in bed. There was also evidence Hicks inflicted a number of injuries on L.W., including black eyes on multiple occasions, bruises on her arms, a "knot" on her forehead, an injury to her lip, and missing hair on her scalp. Hicks had no convictions for domestic violence, but had discussions with family where he admitted committing such acts. After their son was born, Hicks told L.W.'s aunt that he was sorry for being physical with L.W. and that both of them had anger issues and would be seeking counseling.

On February 8, 2018, at around 10:40 p.m., Deputy Diego Flores of the Riverside Sheriff's Department was dispatched on a domestic disturbance call to the Moreno Valley apartment complex where Hicks and L.W. lived with their two children. As Hicks was leaving the apartment and walking to his car, L.W. threw a brick at his vehicle, shattering the window. She then threw the brick at him, and he called the police. Flores issued L.W. a citation, and Hicks left. L.W. and her children, along with her cousin, T.G., returned to the apartment.

After this incident, there were some comings and goings. Hicks and L.W. both returned to the apartment complex around 1:49 a.m.

Surveillance video showed L.W. walking to Hicks's car and speaking to him for a moment before returning to their apartment. Hicks followed. According to Hicks, the argument started when they were still outside. L.W. asked him why he had called the police. When they arrived at the door, L.W. told Hicks she was hesitant to go inside with him because he might try to hit her. She eventually entered the apartment.

The children were asleep on a couch near the front door. Hicks and L.W. were in the kitchen. According to Hicks, they were both frustrated at that point. The conversation continued and escalated, with both of them raising their voices. At some point, L.W.'s then five-year-old daughter, A., began to witness what was occurring. According to her, Hicks punched L.W. and kicked her in the stomach, and there was blood on the floor.

Hicks chased L.W. both inside and outside of the apartment. L.W. suffered multiple stab wounds to her neck, hands and arms, and back. The hand and arm wounds appeared defensive in nature. The neck wound, which cut her carotid and auricular arteries, caused profuse bleeding. L.W. ran out of the apartment screaming for help. Surveillance video showed that L.W. collapsed to the ground at approximately 2:11 a.m. A friend of a neighbor tried to assist L.W. Hicks fled the complex in his vehicle. The police responded to the scene, and L.W. died from the multiple stab injuries.

The police found a significant amount of blood in the apartment's entry, kitchen and living room. They also found a large, bloody knife outside of the apartment in a grassy area. The two children were found on the couch near the front door, awake and very quiet. The police notified Child Protective Services (CPS) about the children, and CPS took the children into custody. A. spoke to social worker Jeanette Austin the night of the murder

4

and later participated in a forensic interview, which we shall discuss in more detail below.

Hicks was arrested the same night after attempting to evade the police. He had a large, fresh cut on his finger.

Hicks was charged with one count of murder pursuant to section 187, subdivision (a). It was further alleged he personally used a deadly and dangerous weapon within the meaning of sections 12022, subdivision (b)(1), and 1192.7, subdivision (c)(23).

At trial, Hicks argued self-defense. The jury ultimately found him guilty of both the murder charge and the enhancement. The court sentenced him to an indeterminate term of 15 years to life, followed by a one-year term for the weapon enhancement. Hicks filed a timely appeal.

II

DISCUSSION

*A. Statements of the Child Witness*

As best we can tell, Hicks concedes both statements—A.'s statement to Austin after the murder, as recorded in Austin's notes, and the contents of the forensic interview—were admissible under hearsay exceptions pursuant to California law. His complaint appears to be that the court erroneously admitted the transcript and the video into evidence, rather than simply allowing the jury to hear their contents. His contention here is that "these transactions cumulatively resulted in a violation of [Hicks's] Constitutional rights." Separately, he argues that allowing the jury to hear these statements at all violated the confrontation clause.

In response, the Attorney General argues Hicks forfeited any confrontation clause claim by not raising it at trial; Hicks's reply brief did not

5

address this issue. The Attorney General also argues there was no confrontation clause error because A. testified at trial, and any state law evidentiary error that occurred by admitting the forensic interview transcript and video recording were harmless.

### 1. Procedural History

Prior to trial, the prosecution submitted a motion in limine seeking to admit A.'s statements to the social worker on the night of the murder and her later forensic interview. After A. and her brother were taken into custody, they were taken to the CPS office and slept there for the remainder of the night. When A. awoke, she and Austin, the social worker, sat together and colored. Without questioning, A. stated: "[S]omething bad happened. Daddy was beating up Mommy. He punched her and then there was blood everywhere. I wanted to talk to him and tell him to stop but I was scared. I didn't want to step in all of the blood. Then he kicked her. That was bad. Mommy ran out the door and said, 'I'm dying.' Then the police came and took Daddy. They put Mommy in the ambulance to fix her and wipe off all the blood." The prosecution argued the statement was "admissible as a spontaneous statement and as past recollection recorded." With regard to the forensic interview, the prosecution contended it was admissible pursuant to Evidence Code section 1237 as a past recollection recorded.

At a hearing prior to trial, as to the statement the morning after the murder, the prosecutor contended that if A. testified at trial and did not recall the night of the murder, her prior statements were admissible as a past recollection recorded. The defense raised several points, but did not raise any issue with respect to the confrontation clause. The court found the statement

6

admissible as an excited utterance, noting the statement was probably also admissible as past recollection recorded if A. did not remember the events of the night of the murder.

As to the forensic interview, the court initially deferred ruling pending A.'s testimony, after which the prosecution could decide if there were particular portions it wanted to admit.

At trial, A. testified. She was nine years old at the time of trial, and she understood the difference between the truth and a lie. She remembered the apartment where she used to live. One night when she was five years old, something scary happened. It was scary because her mother and Hicks were "running around," and A. "didn't know what was happening." A. testified that her mother was "running from [Hicks]." Hicks chased her mother both in and out of the house. She did not remember what, if anything, they said to each other. A. remembered seeing blood on the living room floor. The police came to the house and picked her up off the couch so she would not step in the blood. She did not remember where the blood came from and was "super positive" she did not see anyone bleeding.

A. did not remember certain details, and she testified that night was not something she liked to think about. She stated: "I don't like to worry about it because I do other things in life. And then if I worry about that, then other things don't get done; so I don't like to think about it because I just don't like to." She testified that when she was five years old, if she spoke to the police or the social workers, she would have told the truth. Defense counsel did not cross-examine A. She was excused subject to recall.

Austin, the social worker, testified next. She testified about the statement A. had made to her the morning after the murder in accord with the court's ruling, reading the statement into the record.

7

The issue of the forensic interview was then revisited outside the presence of the jury. The interview had been audio and video recorded.[2] The attorneys and the court reviewed a transcript of the interview, and both counsel agreed that the relevant portions were from pages 9 through 30 of the interview transcript. Defense counsel argued that none of the interview should be admitted, but asked that if the court was inclined to admit the interview, only the specified portions should be admitted. The court overruled the defense objection and found the interview relevant and admissible under the hearsay objection as past recollection recorded. The court noted that A. had testified that her statement to the social workers was true. The court also overruled the objection based on Evidence Code section 352.

In due course, the court read into the record a stipulation between the parties that the forensic interview which they would hear is a true and accurate account of the interview with A. Counsel agreed that the court reporter was not required to transcribe the video recording of the interview as it was played for the jury. Both the video recording and the interview transcript were marked as exhibits. Later, the prosecution made a blanket request to admit all exhibits into evidence, and defense counsel did not offer any further objection. The exhibits published to the jury were received into evidence by the court, including both the video recording and transcript of the interview.

There was a discussion about whether to make the video recording of the interview available to the jury in the event of a readback request. No readback request occurred with respect to A.'s forensic interview.

---

[2] Only the transcript is part of the record on appeal.

## 2. *Standard of Review*

"'In determining the admissibility of evidence, the trial court has broad discretion. . . . A trial court's ruling on admissibility implies whatever finding of fact is prerequisite thereto . . . .' [Citation.] 'We review the trial court's conclusions regarding foundational facts for substantial evidence. [Citation.] We review the trial court's ultimate ruling for an abuse of discretion [citations], reversing only if "'the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.'"'" (*People v. Jackson* (2016) 1 Cal.5th 269, 320-321; see Cal. Const., art. VI, § 13.)

## 3. *Hearsay Objection to A.'s Statement and Forensic Interview*

Hicks apparently concedes that A.'s statements—both her statement to the social worker, as recorded in Austin's notes, and the forensic interview—were admissible as a matter of California hearsay law.[3] His complaint appears to be that the video recording and transcript of the forensic interview were later admitted into evidence.

Evidence Code section 1237, subdivision (b), which addresses the past recollection recorded hearsay exception, states the writing itself (or in this instance, writing and video recording) "may be read into evidence, but

---

[3] Hicks appears to confuse the two statements somewhat. The first statement, which A. gave to Austin after the murder, was not recorded. Austin wrote down A.'s statement to her, and the court admitted it as a spontaneous statement, as noted above. It was not separately admitted as an exhibit. The second statement was the forensic interview, which was both transcribed and video recorded. Both were admitted into evidence late in the trial. He offers no argument as to why the first statement, A.'s oral statement to the social worker, was incorrectly admitted under a hearsay analysis.

9

the writing itself may not be received in evidence unless offered by an adverse party."

We agree that the transcript and video recording of the forensic interview should only have been read to the jury rather than admitted into evidence. We conclude, however, that the error here was harmless under the relevant standard. (*People v. Watson* (1956) 46 Cal.2d 818.) There is simply no tenable argument that Hicks might have received a more favorable outcome if the contents of the exhibits had been heard by the jury, but the writings themselves were not admitted into evidence. The jury would still have heard the contents of the exhibits, and apparently, hearing them once was sufficient; the jury never requested a readback of this testimony. Separate from his confrontation clause argument, Hicks offers no argument that the admission of the exhibits caused him any prejudice, and we find none.

### 4. *Confrontation Clause*

Hicks next contends that both of A.'s prior statements—her statement to the social worker after the murder, and the subsequent forensic interview—should not have been admitted under the confrontation clause. We disagree.

The confrontation clause states that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." (U.S. Const., Amend. VI.) "The right to confrontation may, of course, be waived, including by failure to object to the offending evidence; and States may adopt procedural rules governing the exercise of such objections." (*Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305, 314, fn. 3.)

10

Asserting the confrontation clause requires an objection at trial. "As a general rule, a defendant's failure to object to an alleged trial error relieves an appellate court of the obligation to consider the claim on review. [Citation.] The reason for this rule is to allow the trial court to correct its errors and 'to prevent gamesmanship by the defense.' [Citation.] We have applied this rule numerous times to find forfeiture of a constitutional right of confrontation claim." (*People v. Arredondo* (2019) 8 Cal.5th 694, 710.) The Attorney General explicitly argued this in its respondent's brief, but Hicks offered no response to this contention at all in his reply brief. We conclude that Hicks has forfeited this argument.

Even if he had not done so, any claim of confrontation clause error here is without merit. "'The Sixth Amendment confrontation clause does not bar hearsay statements of a witness who testifies at trial and is subject to cross-examination.'" (*People v. Clark* (2016) 63 Cal.4th 522, 601.)

Hicks appears to assert that A.'s lack of memory as to the events might make a difference, saying her lack of memory made A. "definitionally considered to be 'unavailable.'" This is not the law in California, and the cases Hicks cites are not confrontation clause cases. "'[W]hen the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements.' [Citation.] This is true even if the witness cannot recall the statement." (*People v. Sanchez* (2019) 7 Cal.5th 14, 42.) What matters is the witness's availability for unrestricted cross-examination, which was indisputably present here. (See *People v. Perez* (2000) 82 Cal.App.4th 760, 766.)

Hicks appears to contend that a confrontation clause violation occurred because he "did not have a chance to confront the witness at the

11

time that she gave these statements," but he offers no authority for this argument.

He also claims that he did not have sufficient opportunity to cross-examine A. because "some of the statements were introduced after she had been excused from the stand." The record belies his assertion. After defense counsel chose not to cross-examine A., she was excused subject to recall. Hicks cites to no portion of the record where he attempted to recall her, instead stating A. "was not recalled to the stand." The burden is on the party who wishes to elicit testimony to summon the witness to the stand. Hicks had every opportunity to cross-examine A., and there is nothing in the record to indicate the trial court prevented him from doing so.

Because we find both forfeiture and no error on the merits of Hicks's confrontation clause claim, we need not consider his argument regarding prejudice.

## B. Implied Malice Instruction

Hicks next argues that the court committed error by allowing the introduction of an unconstitutional alternate theory of murder. Specifically, he argues that the jury was improperly instructed on the now defunct natural and probable consequences doctrine. We review claims of instructional error de novo. (*People v. Morales* (2021) 69 Cal.App.5th 978, 990.)

Hicks, however, offers no citation to the record reflecting the jury was instructed on the now abolished natural and probable consequences doctrine. His only argument refers to the inclusion of the natural and probable consequences language in CALCRIM No. 520, the implied malice instruction. Although the instruction uses the words "natural and probable consequence," it does so in a different context. It is not the same as the

abolished natural and probable consequences doctrine, which was set forth in CALCRIM Nos. 402 and 403. There is nothing in the record to suggest the jury was given those instructions or otherwise instructed on the natural and probable consequences doctrine.

CALCRIM No. 520 is a lengthy instruction. As relevant here, it states: "There are two kinds of malice aforethought, express malice and implied malice. Proof of either is sufficient to establish the state of mind required for murder. [¶] The defendant acted with *express malice* if he unlawfully intended to kill. [¶] The defendant acted with *implied malice* if: [¶] 1. He intentionally committed an act; [¶] 2. The natural and probable consequences of the act were dangerous to human life; [¶] 3. At the time he acted, he knew his act was dangerous to human life; [¶] AND [¶] 4. He deliberately acted with conscious disregard for human life." (CALCRIM No. 520.)

Although implied malice is partly defined by an act, the "natural and probable consequences" of which are dangerous to human life, it is not equivalent to the "natural and probable consequences" *theory* of murder, which applied to aiders and abettors. "'[T]he use of the term "natural consequences" in the . . . definition of implied malice does not import into the crime of murder the case law relating to the distinct "natural and probable consequences" doctrine developed in the context of aiding and abetting liability.'" (*People v. Carr* (2023) 90 Cal.App.5th 136, 144.) The changes to the law abolishing the natural and probable consequences doctrine for aiders and abettors "did nothing to remove implied malice as a basis for a second degree murder conviction." (*People v. Roldan* (2020) 56 Cal.App.5th 997, 1005.)

13

In *People v. Carr*, *supra*, 90 Cal.App.5th at page 139, which involved a murder conviction following a drunk driving incident, the court noted: "Implied malice is not imputed malice. It requires that the perpetrator actually and personally harbor malice. [I]mplied malice may be inferred from a defendant's conduct before, during, and after driving drunk — not imputed from the bare fact of driving drunk. Petitioner's contrary argument is an artificial concoction that takes the words 'natural consequences' and/or 'natural and probable consequences' out of their proper legal contexts and dumps them all together into a confused semantic stew." "The natural and probable consequences doctrine is a theory of liability for aiding and abetting. It made an aider and abettor guilty of a murder committed by the perpetrator, even if the aider and abettor lacked malice . . ." (*id.* at p. 143), if certain other requirements are met.

The murder at issue here does not involve imputed malice. Hicks was not an aider or abettor – he was the principal and only possible perpetrator. Not only would instructing the jury on the natural and probable consequences theory of murder have been illegal, it would have made absolutely no sense. But there is no evidence that is what happened here. Instructing the jury on implied malice, however, was not error.

## C. Propensity Instruction

Finally, Hicks asserts the trial court's instruction regarding prior acts of domestic violence as propensity evidence violated due process, and further, that the trial court's comments on the instruction confused the jury.

As pertinent, the court instructed the jury as follows. The portion of the court's instructions that are not part of the text of CALCRIM No. 852 are italicized. Minor changes in language are in nonitalicized

14

brackets.  *"The next instruction is 852, and this instruction links back to the reasonable doubt instruction I read to you. Remember I said to you whenever I say that the prosecution must prove something I mean they must prove it beyond a reasonable doubt unless I specifically tell you otherwise?  Well, this is a narrow category of evidence with a different burden of proof; that lower burden that we talked about, preponderance of the evidence.*  [¶]  . . .  [¶]

"The People presented evidence that the defendant committed domestic violence that was not charged in this case, specifically acts of about allegedly committed against [L.W.]  We had some witness that came in and said that – offered some evidence on that point.

"Domestic violence *includes* [(means)] abuse committed against an adult who is a person with whom the defendant has had a child or a person whom the defendant dated or is dating.

"*In this context* 'abuse' means intentionally or recklessly causing or attempting to cause bodily injur[y].

"You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged domestic violence.  Proof by a preponderance of the evidence is a different burden of proof from proof beyond a reasonable doubt.  A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true.

"*More likely than not, 51/49, if we can quantify it, is preponderance of the evidence.*

"If the People have not met this burden of proof, you must disregard this evidence entirely.

"If you decide that the defendant committed this uncharged domestic violence, you may, but are not required to, conclude from that

15

evidence that the defendant was disposed or inclined to commit domestic violence; and you may conclude, based on that decision, that the defendant was likely to commit and did commit *the crimes charged here*, murder or voluntary manslaughter [as charged here].

"If you conclude that the defendant committed the uncharged domestic violence, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of murder or manslaughter. The People still must prove the charge and allegation beyond a reasonable doubt.

"Do not consider this evidence for any other purpose except for the limited purpose of determining the defendant's credibility.

"*Okay. Let's take another look at that. We heard some testimony of people that if you accept that testimony, you would be able to find that Mr. Hicks committed violence against [L.W.] in the past. It's not part of the charges in this case. That evidence, this instruction, tells you may be used by you to conclude, well, if he did it in the past, maybe he did it this time and maybe he committed this murder. That's up to you to decide if you're going to use it for that purpose. You may also use it to consider his credibility or believability.*

"*Now, the way I suggest you do this is when you go to evaluate that evidence, that testimony, imagine you have a table; you take that testimony and set it on the table. You take all of the evidence that was uncharged -- alleged uncharged acts of domestic violence, and then as part of your deliberations you ask yourself: Am I satisfied by a preponderance of the evidence that he did those other acts? Preponderance, remember, more likely than not.*

16

*"If you are satisfied by a preponderance of the evidence that he committed those uncharged acts, then you can take them off the table and you use it as part of your evidence in this case. If you don't decide, if you're unable to conclude that those acts were committed by a preponderance of the evidence, then you must disregard it and you must not use it in your deliberations. You must leave it sitting on that table."*

In his opening brief, Hicks cites only one paragraph of the court's instruction in support of his claim that the instruction confused the jury or was erroneous. From that point, his analysis skips to an explanation of the admissibility of propensity evidence, in which he seems to concede the evidence was admissible: "In cases of domestic violence, such as what was raised in [Hicks's] case the admission of these 'other offenses' as proof of propensity is permissible." He then argues that pre-1999 instructions "effectively authorized a route to conviction on evidence falling short of the reasonable doubt standard."[4] He does not quote or explain these instructions or state why they are similar to any part of the instructions actually given.

We find no error. "In assessing a claim of instructional error or ambiguity, we consider the instructions as a whole to determine whether there is a reasonable likelihood the jury was misled." (*People v. Tate* (2010) 49 Cal.4th 635, 696.) No such reasonable likelihood exists here because the actual instruction given was CALCRIM No. 852. The additional language the court added to explain the instruction did not lower the burden of proof; indeed, the court made it clear that the jury could not use the prior acts to convict Hicks of murder, but "'that conclusion is only one factor to consider

---

[4] Moreover, he relies only on Ninth Circuit cases, and does not mention that in *People v. Loy* (2011) 52 Cal.4th 46, 71-74, the California Supreme Court found the pre-1999 instruction constitutionally permissible.

along with all the other evidence.'" (*People v. Kerley* (2018) 23 Cal.App.5th 513, 541.)

The jury was also instructed elsewhere that Hicks was "presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt. Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt unless I specifically tell you otherwise." The jury was also instructed on the elements of murder and manslaughter and the union of act and intent. Taken together with the other instructions, no reasonable juror would find the court's comments confusing or interpret them as lowering the burden of proof required to convict Hicks of murder.

In his reply brief, Hicks claims it was "uncertain" as to whether the jury relied on the preponderance or reasonable doubt standard to find him guilty of murder. His claim of jury "confusion" is supported only by one question from the jury during deliberations: What would happen if the jury could not unanimously agree on first or second degree murder? Hicks provides no reason at all why this question should be interpreted as reflecting jury confusion as to the propensity evidence, the standard required to find him guilty of murder, or anything else related to this instruction.

The jury was given a correct instruction, and "courts presume that juries can and will dutifully follow the instructions they are given, including instructions that limit a jury's consideration of evidence for certain purposes or against certain parties." (*People v. Washington* (2017) 15 Cal.App.5th 19, 26.) Accordingly, Hicks's claim of instructional error lacks merit.

As we have found no error, Hicks's claims of cumulative error warrant no further discussion.

## III
## DISPOSITION

The judgment is affirmed.

MOORE, ACTING P. J.

WE CONCUR:

GOETHALS, J.

GOODING, J.